**BELLAIRE GENERAL HOSPITAL, INC.,**
d/b/a Bellaire General Hospital,
Appellant,

v.

Harvey D. CAMPBELL, Individually,
et al., Appellees.

No. 1000.

Court of Civil Appeals of Texas,
Houston (14th Dist.).

May 15, 1974.

Rehearing Denied June 5, 1974.

L. W. Anderson, Anderson, Henley, Shields, Bradford & Pritchard, Dallas, A. D. Dyess, Jr., Foreman, Dyess, Prewett, Rosenberg & Henderson, Houston, for appellant.

John Gano, Jamail & Gano, Houston, for appellees.

TUNKS, Chief Justice.

Appellee Harvey D. Campbell brought suit individually and as next friend of his two sons against appellant Bellaire General Hospital for the wrongful death of his wife, Lucille T. Campbell. In accordance with a jury verdict, judgment was rendered in favor of the Campbells. The Hospital appeals from the refusal of the trial court to grant its motion for judgment notwithstanding the verdict. It did not file a motion for new trial.

■ The Hospital stipulated that it was negligent in not having a properly working oxygen supply in the room to which Mrs. Campbell was taken, in not having a useable portable oxygen supply available to her while she was being moved into the room, and in not having available a cardiac stimulator. The jury found each of the first two stipulated items of negligence to be a proximate cause of her death. By this appeal the Hospital contends that there was either no evidence or factually insufficient evidence to support the jury's findings of proximate cause. However, it is limited in this appeal to "no evidence" points. A judgment notwithstanding the verdict would have been proper only if there had been no evidence to support the verdict. The trial court may not grant a judgment contrary to the verdict on the basis of insufficient evidence. Garza v. Alviar, 395 S.W.2d 821 (Tex. Sup.1965).

■■ At the outset it should be noted that the Campbells contend that the record contains an incomplete statement of facts and that this Court is therefore precluded from reversing on evidentiary grounds. This contention is founded upon the fact that a blackboard was utilized to a certain extent and that neither the blackboard nor a photograph of it is before this Court. It is true, that, as stated in Young v. Stafford, 497 S.W.2d 76 (Tex.Civ.App.—Houston [14th Dist.] 1972, no writ), if a court of civil appeals is unable to determine with a reasonable degree of clarity what evidence was actually presented to the jury, then it is unable to reverse on evidentiary grounds. In the present case, however, the blackboard was used only to list certain items which are also included in the autopsy report, which is before this Court. We therefore hold that the use of the blackboard during the trial of this case does not preclude consideration of the Hospital's "no evidence" points.

Mrs. Campbell died on Sunday, August 9, 1970, at the age of forty-four, while a patient at Bellaire General Hospital. Death occurred shortly after she was moved from Room 106 to Room 109. She had first noticed severe abdominal pains on Wednesday, August 5. She had had similar pains, although of a lesser degree, sporadically over a period of several months. On Thursday morning she went to the office of Dr. R. D. Dyer for medical assistance with her abdominal problems. Dr. Dyer had his office in a professional building adjacent to the Hospital. After an initial examination he decided that she should be admitted to the hospital for a more detailed examination. Late Thursday evening Dr. Dyer and a Dr. Shelton performed an exploratory laparotomy for diagnostic purposes. This major surgery disclosed that Mrs. Campbell was afflicted with acute pancreatitis, an inflammation of the pancreas.

Dr. Dyer prescribed a course of treatment for Mrs. Campbell which included naso-gastric suction, the drug Probanthine, antibiotics, and fluids. The naso-gastric suction is designed to remove stomach secretions and gases, so that the stomach will be more stationary. Probanthine serves the purpose of reducing pancreatic secretions. Dr. Dyer testified that it is also possible to surgically remove part or all of the pancreas, but that he considered removal as a radical procedure.

The facts leading up to Mrs. Campbell's death are not entirely clear, but the following review is supported by the record. On Saturday Mrs. Campbell was progressing sufficiently to be moved from the intensive care unit to a semi-private room. Her family was with her most of the time, and she received other visitors. She received additional visitors Sunday morning and was apparently feeling well under the circumstances. At 3:00 Sunday afternoon she began having trouble breathing and turned slightly cyanotic (a condition whereby insufficient oxygen in the blood stream causes the skin and lips to turn a bluish color). At that time oxygen was prescribed for her by Dr. Shelton by means of positive pressure breathing, and this appeared to alleviate her respiratory problems to a certain extent. There is no evidence concerning why she had difficulty breathing. At 6:00 P.M. her cyanosis worsened sufficiently to cause apprehension to a nurse, who attempted to call Dr. Dyer. The amount of oxygen she was receiving was increased, and her condition appeared to stabilize somewhat.

Because of Mrs. Campbell's breathing difficulties and her restlessness, Mr. Campbell requested that she be moved to a private room. Her doctors agreed with this request by phone, and it was decided to postpone her movement until after 9:00 P. M., when visiting hours were over. Around 9:20 this procedure began. Her oxygen supply was unplugged from the wall outlet, and she and her bed were moved from Room 106 into the hallway. Mr. Campbell and the couple's two teenage sons were present while this was being done, but they did not actually participate. She was moved down the hall the distance of one room and into Room 109, which was on the opposite side of the hallway. After her bed had been placed up against the wall in Room 109, a nurse attempted to connect her oxygen supply to the wall outlet in that room. At that time it was discovered that, because of the design of a permanent lighting fixture in that room, it was impossible to lock the oxygen hookup into the outlet, which was necessary before oxygen would flow from the outlet to Mrs. Campbell. The hookup is normally accomplished by inserting the unit into the outlet and then turning it to a vertical position to lock it in place. In Room 109, however, the light fixture was constructed so close to the outlet that there was insufficient room to accomplish the locking of the hookup.

Several nurses attempted unsuccessfully to make the hookup. Mr. Campbell also tried to do so. It was determined that there was insufficient time to take her back to Room 106, and a nurse was dispatched to bring a portable oxygen unit. Dr. Wilson, a staff doctor, was also sent for. The time span of the events following the disconnection of the oxygen supply to Mrs. Campbell is unclear, but apparently five minutes passed before a portable unit was provided for her. This portable unit consisted of a face-mask type design, rather than the nasal, forced breathing type unit to which she had formerly been connected. One of the nurses testified that Mrs. Campbell stopped breathing while in the hallway. Mr. Campbell said that his wife was violently gasping for oxygen while in Room 109, and that she suddenly ceased to breathe and her head fell to the side of her bed. As soon as Dr. Wilson arrived he began to give her mouth-to-mouth resuscitation. The portable unit arrived shortly thereafter but its use did not seem to help Mrs. Campbell.

During this five-minute period, the area of the Hospital in question was in a state of pandemonium. Mrs. Campbell's sixteen-year old son stated that the nurses had unbelieving looks on their faces when it was discovered that the oxygen system would not function. He said that "by this time she [Mrs. Campbell] was just gasping and her eyes were wide, I mean she looked

horrible." Dr. Dyer arrived and pronounced Mrs. Campbell dead a short time later.

The question in this case is what caused the death of Mrs. Campbell. The jury found that the negligent acts of the Hospital, in not having a properly working oxygen supply in Room 109 and in not having a useable portable oxygen supply available during the move, were proximate causes of her death. There was no direct evidence that oxygen starvation was the actual cause of death. The death certificate, which was signed by Dr. Dyer, listed the immediate cause of death as cardiac arrest, although he testified that it was impossible to determine the actual cause of death. Lack of oxygen can produce brain damage, which can lead to cardiac arrest. His testimony reveals that he considered it very unlikely that Mrs. Campbell would have recovered even if the oxygen malfunction had not occurred, although pancreatitis is not always terminal. (In fact, Dr. Dyer had recovered from the disease about a year earlier.) Of course, it is not unusual for a person with an adequate intake of oxygen to suffer a cardiac arrest.

■ The mere possibility that an act of negligence might have caused the damages, from a medical viewpoint, is not sufficient to support recovery. It must be shown that the act probably caused the injuries. The general rule, as stated in Lenger v. Physician's General Hospital, Inc., 455 S. W.2d 703, 707 (Tex.Sup.1970), is as follows:

[E]xpert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event.

Proof of reasonable probability will suffice, since it is often difficult to determine with exactitude the medical cause of death.

Although a workmen's compensation case, Insurance Company of North America v. Kneten, 440 S.W.2d 52 (Tex.Sup. 1969), involved similar questions relating to evidence of causal connection between an event and injury or death. In that case the plaintiff came into contact with the exposed electrical cord of a drill he was operating while in the course and scope of employment. It was a damp day, and he was covered with perspiration. He felt a shock pass through his body, but continued to work for about five minutes. He then decided that he should see his doctor for chest pains which developed after the shock. It was determined that he had a damaged heart. The Supreme Court held that the jury determination that the shock had caused the heart attack was supported by the evidence, despite the fact that he had complained of similar chest pains on other occasions and the fact that the medical expert testified only that the shock "could have" caused the heart attack. The Court said, at pages 53 and 54:

In the present case the fact finder had direct evidence of the occurrence on the job when the employee, while wet with sweat in the heat and effort of his work, was shocked throughout his body with an electrical current. The fact finder was told of the prompt onset of symptoms with the employee feeling bad within a few minutes and his distress progressing until he was in a critical state in the hospital within a few hours. The doctor testified that this distress was due to a heart attack and that the heart is still impaired. Further, the doctor testified that what happened on the job could precipitate a heart attack. With those facts given, it was not conjecture on the part of the jury to conclude that the occurrence on the job was probably a cause of the attack and resulting disability.

Since the question is what precipitated *this attack at this time,* it requires no expert to decide the probabilities when the trier of fact is given evidence of prompt

onset of the attack following an occurrence competent to affect adversely a defective heart.

■ In this case Mrs. Campbell, because of the admitted negligence of the Hospital, was denied the supply of oxygen which had been prescribed for her. While so denied she became a bluish color, gasped for breath, her eyes bulged, and she died. Under the circumstances there was some evidence to support the jury's findings that her death was proximately caused by the negligence of the Hospital in not having available an adequate oxygen supply. Also, death ensued within a matter of minutes after Mrs. Campbell was disconnected from the oxygen supply. It was a reasonable inference on the part of the jury that her condition would have remained stable if the negligence of the Hospital had not occurred. It was also within the province of the jury to find that a person deprived of oxygen will eventually die. Even if it be assumed that her chances for recovery from the pancreatitis were remote, the Hospital would still be liable for depriving her of any chance she might have had. In this case, as in the Kneten case, the doctor who testified failed to negate "the reasonableness of the finding of causal connection."

■ It should also be noted that Dr. Dyer's testimony, although quite equivocal, supports a conclusion that, in reasonable medical probability, the lack of oxygen caused Mrs. Campbell's death. The following interchange occurred on direct examination:

Q. . . . lack of oxygen to this lady was a contributing cause of her death, right?

A. Probably.

\* \* \* \* \* \*

Q. That is your opinion that lack of oxygen to this lady was a factor in her death. That is what you are telling us, it is your opinion, isn't it?

A. Probably a contributing factor.

Q. And that opinion is based upon reasonable medical probability, isn't it?

A. Yes.

Although Dr. Dyer also stated that he did not think the malfunction of the oxygen equipment caused Mrs. Campbell's death, to sustain a verdict under the attack of "no evidence," it is only necessary that there be more than a scintilla of evidence.

The trial court properly overruled the Hospital's motion for judgment notwithstanding the verdict.

Affirmed.