Santiago and Guadalupe VALDEZ, et al., Appellants,

v.

LYMAN–ROBERTS HOSPITAL, INC., et al., Appellees.

No. 1894.

Court of Appeals of Texas, Corpus Christi.

June 24, 1982.

Rehearing Denied Aug. 26, 1982.

112

Peter Steiner, Tony Bonilla, Bonilla, Read, Bonilla & Berlanga, Inc., Corpus Christi, for appellants.

C. Dean Davis, David M. Davis, Davis & Davis, Austin, Lola L. Bonner, Rockport, for appellees.

Before NYE, C.J., and YOUNG and GONZALEZ, JJ.

## OPINION

NYE, Chief Justice.

This is an appeal from a judgment granting defendants-appellees' Motions for Instructed Verdicts at the conclusion of plaintiffs-appellants' case. Appellants are Santiago and Guadalupe Valdez, et al (Valdez), and appellees are Lyman-Roberts Hospital, Inc.; Aransas Hospital, Inc.; Mary Murphy and Sonja Rodriguez. Suit was originally filed by the parents and children of Juanita Valdez, seeking damages for the death of their daughter and mother. At the time of her death, Juanita Valdez was eight months pregnant and seeking medical and nursing assistance. The timetables leading up to Ms. Valdez' death are not entirely clear, but the following review is supported by the record.

At approximately 11:00 p.m., on the night of March 7, 1979, the decedent awakened ill and vomiting at her home in Rockport. The appellants, thinking the decedent was beginning labor pains, took her, in accordance with a prearrangement, to a midwife's house in Gregory, Texas. Upon arriving at the midwife's house, the decedent was examined; and it was determined that she was not in labor, but was seriously ill. The midwife so instructed the family and suggested that they take the decedent to a hospital. The family left Gregory, Texas, and proceeded to the Aransas Hospital in Aransas Pass. At this hospital, the decedent was taken by wheelchair to the labor room where a nurse, Sonja Rodriguez, attempted to take her vital signs. While Nurse Rodriguez was attempting to take the decedent's vital signs, a member of the Valdez family placed a call to Dr. Kumm of the Aransas Hospital. Dr. Kumm was not the doctor on call at that time, but was the Chief of Obstetrics at Aransas Hospital. Dr. Kumm spoke with Nurse Rodriguez. As to this conversation, Nurse Rodriguez testified that Dr. Kumm instructed her to inform the family of the limited facilities located at Aransas Hospital and that if the patient was seriously ill, they should take her to another hospital where she could receive the best possible care as quickly as possible. Nurse Rodriguez informed the family as to what Dr. Kumm had told her. The family left. (They had been there approximately 25–30 minutes.) Nurse Rodriguez testified that when the Valdez family left Aransas Hospital, she was not sure whether they were going to Lyman-Roberts Hospital a few blocks away or to Memorial Medical Center in Corpus Christi.

After leaving Aransas Hospital, the family took the decedent to Lyman-Roberts Hospital, arriving somewhere between 1:30 a.m. and 2:00 a.m. Their stay at Lyman-Roberts Hospital also lasted approximately 25 minutes. The record reflects that Nurse Murphy was the nurse in charge at Lyman-Roberts Hospital on the night in question. When the family arrived at Lyman-Roberts, Nurse Murphy informed them that they would have to go to Corpus Christi because the decedent was not a patient of any doctor at the hospital. This first encounter took approximately 10 minutes. After being turned away, the family went back to the car where they discovered that Juanita was in even greater pain, so they once again went to the emergency door and requested an ambulance. This time Nurse Murphy went to the car and said that she observed the following: That the decedent was in advanced pregnancy; that she was very large; that she had vomitus on her clothing; that she was lethargic; that her skin was pallid and moist; and that she was not perspiring freely. The decedent's breathing was in excess of normal, but it was not labored nor was she hyperventilating. Nurse Murphy testified that the decedent was ill and that she was fearful that the decedent was going into premature labor. However, upon examination, Nurse Murphy could not find any signs that decedent was in premature labor. The family requested that Nurse Murphy call a specialist. Nurse Murphy in turn informed the family that the quickest way they could get help for the decedent was to go to Memorial Medical Center in Corpus Christi. Nurse Murphy stated that she recommended that the family go to Memorial Medical Center because she knew that the decedent needed further evaluation.

The family, upon leaving Lyman-Roberts, returned to Rockport, Texas, and arrived home at 2:30 a.m. The autopsy report established that the decedent died at approximately 2:30 a.m. of a ruptured uterus.

■ At the close of appellants' testimony, the trial court entered a directed verdict in favor of both appellees, Aransas Hospital and Lyman-Roberts Hospital, based upon their finding that there was no evidence to prove that the negligence of the appellee hospitals proximately caused the death of Juanita Valdez.[1]

■ In an instructed verdict case, the appellate court must determine whether there is any evidence of probative force to raise fact issues on the material question presented. In doing this, the court must consider the evidence in the most favorable light in support of plaintiff's position and disregard all contrary evidence and inferences. *Collora v. Navarro,* 574 S.W.2d 65 (Tex.1978); *Henderson v. Travelers Insurance Company,* 544 S.W.2d 649 (Tex.1976). When reasonable minds may differ as to the truth of controlling facts, the issue must go to a jury. *Collora,* supra.

The question in the present case is whether or not the negligence of the hospital(s) proximately caused either the death of Juanita Valdez or injuries which resulted in damages to her estate. The proof that must be met to establish this causal relationship is easily stated, but is often difficult to ascertain when a sufficient showing has been made to warrant submission of the issue to the jury. Since liability cannot turn upon speculation or conjecture, it is essential that the evidence establish causal connection beyond the point of conjecture. *Allied Stores of Texas, Inc. v. McClure,* 595 S.W.2d 165 (Tex. Civ. App.—Tyler 1980, rev'd on other grounds, 608 S.W.2d 901 [Tex.1980]).

■ The mere possibility that an act of negligence might have been the proximate cause of damages from a medical viewpoint is not sufficient to support recovery. It

---

1. It should be noted that the two appellee hospitals have admitted their negligence. While a private hospital may conduct its business largely as it sees fit, liability on the part of the hospital may be predicated on the refusal of service to a patient in the case of an unmistak-able emergency if the patient has relied upon the custom of the hospital to render aid in such a case. There is evidence in this record of the reputation of the two appellee hospitals for taking emergency patients. See: Annot., 35 A.L.R.3d 841 (1971).

must be shown that the act probably caused the injury. *Bellaire General Hospital, Inc. v. Campbell,* 510 S.W.2d 94 (Tex. Civ. App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.).

 The trier of fact is usually allowed to determine the issue of causation when probable causal relationship is shown by expert testimony. *Lenger v. Physicians' General Hospital, Inc.,* 455 S.W.2d 703 (Tex. 1970). However, expert testimony that an event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event. *Lenger,* supra.

Turning now to the evidence in the record of this case,[2] Dr. Leslie Archer, appellants' expert medical witness, testified to the following: When questioned on whether or not stabilization of a patient with symptoms like those of the decedent would improve the patient's chances of survival, Dr. Archer responded that *"it was essential."* Dr. Archer also testified that, while a ruptured uterus is not a common occurrence, the symptoms that occur with it are common in that they are similar to an abruptio placenta. Dr. Archer also stated that any modern obstetric unit should have the facilities to handle the same. Dr. Archer stressed throughout his testimony that proper diagnosis was imperative, meaning that the quicker the abdomen is opened to find out where the bleeding is, the better the chance of surviving. Dr. Archer also testified that any modern obstetrics unit, including small ones, should have the facilities to handle a surgical catastrophe involving a pregnant woman within a 35–40 minute time frame. With regard to the decedent, Dr. Archer stated:

"... A: The point is she needed to be examined and have her vital signs taken by someone, yes.

Q: Well, she needed more than just her vital signs taken, didn't she?

A: Yes, of course.

Q: And that had to be communicated to somebody that could do something?

A: Yes, that's right, to call her doctor.

\* \* \* \* \* \*

Q: And so what we would like to have had would have been for her at the time that it looked like she needed immediate care to have gotten it, regardless of where?

A: Yes, sir.

Q: Is that the sum of your testimony?

A: Yes."

When asked if an improper nursing assessment was made at Lyman-Roberts Hospital, Dr. Archer responded:

"A: In the sense that I would say that a sufferer coming to the door of the emergency room, is asking for treatment for their suffering and needs to be assessed in the best manner possible, I would have to say, yes, I would disagree, that she should have been inside to be assessed.

\* \* \* \* \* \*

Q: All right. I think my final line of questioning, Dr. Archer, will be to have you indicate whether or not you think there are different capabilities in different facilities, just start with that simple composition. Do different facilities have different capabilities?

A: Yes, but size and multiplication of number of beds and number of operating rooms is not the same thing as saying that the differences obtainable in care are not much more similar than might appear from mere size characteristics. For instance, Mr. Bonilla's list of operations done in one or the other of these places [Lyman-Roberts or Aransas Hospital] maybe both for all I know, illustrates that there is a great deal of major surgery done there.

Q: At two A.M. in the morning?

A: Well, again I say if the place is licensed to do obstetrics, and my wife or your daughter is going to be there under Doctor X, and he's not ready to deal with an immediate complication, that place

---

2. The record consists of 2007 pages of testimony.

should lose its license in obstetrics. Yes, certainly at two A.M. Why not?"

Dr. Archer testified as follows:

"Q: All right. Now, Doctor, based on your qualifications, your familiarity with the generally recognized accepted standards of good nursing procedures and practices and the delivery of hospital care to patients in this area and in the State, and based on your review of the autopsy, the depositions, the hospital policy manuals, do you have an opinion as to whether or not, in reasonable medical probability, Juanita Ernestina Valdez could in fact have recovered and be alive today had proper diagnosis and treatment of her condition been made?

A: *Yes, she could be.*" (emphasis supplied)

Dr. C. H. Lewis, D.O., Administrator of the Aransas Hospital and Chief of Staff, stated that he would recommend nurses on his staff to notify the attending physician in situations such as the one which was present on the night of March 7, 1979.

Both appellees point to statements in the record which conflict with some of the above stated testimony. For instance, Dr. Lewis stated that Juanita Valdez probably would have died even if there had been a surgical team standing by to operate. He also testified that his hospital, Aransas Hospital, was not equipped to handle such emergency surgery. While this type of evidence may go to the sufficiency of the evidence, it is not to be considered under a directed verdict attack on proximate cause. In fact, such evidence must be totally disregarded, and only the evidence most favorable to the plaintiff may be considered.

Thus, after reviewing the above evidence and all the evidence in the record, we believe that the directed verdicts were improper. The evidence raises a reasonable inference from which the jury could have found than Juanita Valdez could have been stabilized if the negligence of the hospital had not occurred. There was evidence from which the jury could have found that, had there been proper diagnosis and treatment, Juanita Valdez could have recovered and be alive today. Appellees, on the other hand, argue that appellants have the burden of proving that "proper diagnosis and treatment" could have been made at the time in question under the same or similar circumstances. Appellants have satisfied this burden by establishing that *no doctor was called* and by Dr. Archer's testimony that Juanita Valdez could be alive today had she received proper care and treatment. Viewing the evidence most favorable to the Valdez family, the jury, based on medical testimony and not mere conjecture, was entitled to determine whether there could have been proper medical treatment for Juanita. Again, the medical testimony from Dr. Archer states that any hospital should be equipped to handle emergency obstetrics.

We believe that this is a type case in which the jury could ask, based on the medical testimony, "but for the acts or omissions of the defendants, would the death or disability have occurred?" While it may be undisputed that the cause of death was a ruptured uterus, such an illness is not necessarily fatal. There is enough evidence in the record from Dr. Archer to give rise to a fact issue on proximate cause, i.e., had either one of the hospitals called a doctor or stabilized the patient, Juanita Valdez' chances of survival would have been infinitely better. Even if it be assumed that her chances for recovery were remote, the hospital would still be liable for depriving her of any chance she might have had. The burning candle of life is such a precious light in anyone's existence that no one has a right to extinguish it before it flickers out into perpetual darkness and oblivion. See: *Bellaire General Hospital, Inc. v. Campbell,* 510 S.W.2d 94 (Tex. Civ. App. —Houston [14th Dist.] 1974, writ ref'd n.r. e.). *Sciandra v. Shovlin,* 418 Pa. 378, 211 A.2d 437 (1965). Therefore, if the appellee hospitals accelerated Juanita Valdez' death by even an hour, minutes or seconds, they could be liable. If their admitted negligence caused Juanita Valdez additional pain and suffering, appellee hospitals could be liable to her estate. Compare: *Rains v. Heldenfels Brothers,* 443 S.W.2d 280 (Tex.

Civ. App.—Corpus Christi 1969, writ ref'd n.r.e.).

In conclusion, after reviewing the entire record, we cannot say that the evidence offered to prove the vital fact of causation is so weak as to no more than create a mere surmise or suspicion of its existence. We hold that the circumstances shown by the evidence is such as to call for a factual determination of whether Juanita Valdez' death or type and time of death was caused by the hospitals' negligence. Accordingly, we sustain appellants' first point of error and remand this case for a new trial.

To facilitate the retrial of this case, we will briefly discuss some of appellants' other points. In point of error number two, appellants contend that the trial court erred in disallowing the filing of an amended petition and trial amendment. By these motions to amend, appellants sought to bring a cause of action based on the Survival Act and to allow the sisters of the decedent to bring a cause of action for themselves. In support of this contention, appellants argue that Rule 63 allows a party to amend its plea so long as such amended plea does not operate as a surprise to the opposing party and is not filed within seven days of trial. In the present case, the trial court, in accordance with Rule 166, T.R.C.P., signed a second order at pre-trial conference which stated that the deadline for amendments to appellants' pleadings was September 26, 1980, and October 1, 1980, for defendant-appellees. Appellants did not file their First Original Petition until October 1, 1980. Since the filing was after the stated deadline, the trial court refused to allow the amendment.

Rule 166 allows a trial court to set a time in which all amendments must be presented to the court. While Rule 63 does allow the filing of an amendment within seven days of trial, the rule also states:

"... provided, that any amendment offered is filed within 7 days of trial or thereafter, *or after such time as may be ordered by the judge* under Rule 166, shall be filed only after leave of the judge is obtained ...." (emphasis added)

Therefore, appellants' amended petition, which they attempted to file after the date the trial court ordered, could only be made with leave of the court. *Casteel v. Gunning,* 402 S.W.2d 529 (Tex. Civ. App.—El Paso 1966, writ ref'd n.r.e.); Rules 63 and 166, T.R.C.P. No error is shown.

A denial to file an amended petition under the present fact situation is a discretionary matter and will not be overturned on appeal unless a clear abuse of discretion is shown. *Plata v. Guzman,* 571 S.W.2d 408 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.); *Roeber v. DuBose,* 510 S.W.2d 126 (Tex. Civ. App.—Corpus Christi 1974, no writ). This burden is on the complaining party. *Plata v. Guzman,* supra. Something more than a request and a refusal must appear in the record before an appellate court will reverse on an abuse of discretion point. In this connection, where it appears that the new matter was known to the parties seeking to file the amendment, or by exercising reasonable diligence, it could have been known at such a time as would have enabled them to include it in their former plea, the request should be denied.

In the present case, a period of 15 months had lapsed between the time appellants filed their suit and the time given them to amend their plea. We think the appellants have failed to demonstrate that the trial court's ruling was arbitrary and that they have failed to show that the trial court abused its discretion. Point of error two is overruled.

In point of error three, appellants contend that the trial court erred in failing to allow them (the sisters of the decedent) to prosecute a cause of action for witnessing the death of decedent. Having held in the previous point of error that the trial court did not err in failing to allow a trial amendment for the sisters, we find this point to be without merit. Point of error number three is overruled.

Point of error four states that the trial court erred in not allowing appellants to inform the jury of the suspension from nursing practice of Mary Murphy.

Appellants argue that this information was relevant in order to impeach Ms. Murphy. At the time of the trial in the present case, the suspension of Nurse Murphy was in the appellate stage; therefore, the trial court did not commit reversible error in refusing to allow the jury to be informed of Nurse Murphy's suspension. In the present case, the administrative ruling suspending Murphy's license did not become final until all appellate routes had been exhausted,[3] the general rule being that an administrative agency may rescind its action on a matter that has not become final. *Superior Oil Co. v. Board of Trustees of the Magnolia Indep. Sch. Dist.,* 410 S.W.2d 504 (Tex. Civ. App.— Eastland 1967, writ ref'd n.r.e.); *South Taylor County Independent School Dist. v. Winters Independent School Dist.,* 151 Tex. 330, 249 S.W.2d 1010 (1952); Tx. Jur. 2d § 30.

Appellants contend in point of error five that the trial court erred in excluding evidence of the rules and regulations of the Board of Nurse Examiners. The prevailing theory on the introduction of provisions of regulatory measures is that they are inadmissible absent a showing of their application to the situation in question and a clear violation of the regulation. *Simms v. Southwest Texas Methodist Hospital,* 535 S.W.2d 192 (Tex. Civ. App.—San Antonio 1976, writ ref'd n.r.e.) (and cases cited therein). In the present case, whether or not Nurse Murphy violated her nursing regulations was an extremely important factor; therefore, the rules and regulations of the Board of Nurse Examiners was relevant. However, after carefully considering the entire record, we are of the opinion that the proper predicate was not laid for their introduction by the appellants. Accordingly, appellants' fifth point of error is overruled.

In point of error ten, appellants contend that the trial court should have allowed the prior testimony of Dr. Leonard Sayers, which was given before the administrative hearing of the Board of Nurse Examiners, to be admitted. Statements made in evidence upon a previous judicial proceeding may be received upon a subsequent trial as evidence of the truth of such statements where the witness who gave the evidence on a former hearing is now unavailable. However, it must be shown that the party against whom the evidence is now offered had the opportunity to cross-examine the witness at the former trial on the same issues as that on whichthe evidence is now offered. Ray, Texas Law of Evidence, § 941 p. 193 (Texas Practice 2d Ed. 1980). When these requisites have been met, the evidence should be receivable whatever the character of the former proceeding, i.e., whether it was judicial, legislative or *administrative.* Ray, Texas Law of Evidence, § 952 p. 214 (Texas Practice 2d Ed. 1980). In the present case, if the proper predicate had been laid, the testimony of Dr. Sayers would have been admissible.

After carefully reviewing appellants' remaining points of error, we are of the opinion that they are unlikely to occur at the next trial. Therefore, they need not be considered.

The judgment of the trial court is reversed and the cause remanded for a new trial.

---

**3.** *Murphy v. Rowland,* 609 S.W.2d 292 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r. e.).