Patricia J. BROWN, Appellant,

v.

Sidney W. HOPKINS, Appellee.

No. 13–94–418–CV.

Court of Appeals of Texas,
Corpus Christi.

Feb. 29, 1996.

Kevin W. Grillo, Robert C. Hilliard, Hilliard, Grillo & Munoz, Corpus Christi, for Appellant.

Mary A. Goldsmith, Roland L. Leon, Vaughan Waters, Thornton, Summers, Biechlin, Dunham & Brown, Corpus Christi, for Appellee.

Before SEERDEN, C.J., and DORSEY and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

FEDERICO G. HINOJOSA, Jr., Justice.

This is an appeal from a take-nothing jury verdict in a personal injury case. Appellant, Patricia Brown, filed suit against Sidney Hopkins claiming that his negligence caused her harmful exposure to the "restricted-use" pesticide, BIDRIN 8. By ten points of error, appellant contends that the trial court erred. We affirm.

Patricia Brown was a research technician at the Texas A & M University Agricultural Research and Extension Center (Center) located on Highway 44 in Nueces County. Brown tended the cotton, sorghum, and corn plants involved in the Center's research. Dr. John Benedict, a professor of entomology at the Center, supervised Brown. Hopkins, a graduate student working towards a Ph.D. degree in entomology, was also under Dr. Benedict's supervision.

On February 3, 1991, Hopkins sprayed a greenhouse cotton crop with BIDRIN 8, an organophosphate compound. Before spraying, Hopkins told Dr. Benedict that the cotton plants were infested with aphids, and they agreed that the plants should be sprayed with BIDRIN 8. Although Hopkins is licensed by the State of Texas to apply "restricted-use" pesticides, including BIDRIN 8, he contends that he was acting under Dr. Benedict's direction, control, and applicator license. Dr. Benedict agrees with Hopkins.

The solution strength of BIDRIN 8 that was ordered by Dr. Benedict was disputed. Dr. Benedict believes that, in accordance with labeling requirements, he ordered a so-

lution of ten *milliliters* of BIDRIN 8 for each gallon of water. However, Hopkins and Brian Brown, a former employee of the Center, testified that they heard Dr. Benedict order a solution of ten *ounces* of BIDRIN 8 for each gallon of water. The BIDRIN 8 solution that was sprayed on the greenhouse cotton crop was estimated to be thirty times more concentrated than legally allowed by federal and state laws.

Brown claims that Hopkins also failed to post a required warning sign on the outside of the greenhouse.[1] Hopkins and others contend that a sign was posted as required and that the greenhouse was locked.

On the afternoon of February 4, 1991, Brown entered the greenhouse to check the cotton plants. Brown testified that she was in the greenhouse for about an hour when she began to feel dizzy and short of breath. She returned to her office and told another supervisor that she felt a little strange. At Dr. Benedict's suggestion, Brown remained at the Center until she felt well enough to drive herself home. Although she had a headache, Brown returned to work the next day. Brown found out that the cotton plants were sprayed with BIDRIN 8 sometime after she returned to work. Hopkins contends that Brown was told immediately after she became ill that the cotton plants had been sprayed with BIDRIN 8. Brown did not consult a doctor for some time after the incident.

On July 18, 1991, Brown ended her six-month probationary period at the Center. An evaluation, performed by Dr. Benedict, noted 1) that Brown had a difficult time interacting with other people and 2) that she was very sensitive. A decision to terminate Brown's employment was made and she was informed. At her request, Brown was given a second chance. Two days later, she filed a number of grievances with the University, including, for the first time, a formal complaint against Dr. Benedict for her exposure

---

1. According to a bottle of BIDRIN 8, the following warning must be posted:
 DANGER! Area treated with BIDRIN Insecticide on (date of application). Do not enter without appropriate protective clothing within 48 hours after treatment. (Insert here actions to take in case of accidental exposure. See statement of practical treatment for details.) According to a letter of non-compliance issued by the Texas Department of Agriculture, a sign was posted in the wrong location.

to BIDRIN 8. In the complaint, Brown made it clear that she believed Dr. Benedict was responsible for Hopkins' actions.

Brown continued working at the Center until November 1991, when the Center was scheduled to spray crops with an organophosphate pesticide. Because her physician had recommended that Brown avoid subsequent exposure, she was placed on a leave of absence. In January 1992, Brown began teaching for the Corpus Christi Independent School District. At the time of trial, Brown was still teaching.

On August 21, 1991, Brown filed suit against Hopkins and Hopkins Agricultural Service. On February 3, 1993, Brown amended her petition and added Shell Oil Corporation, E.I. du Pont de Nemours, Inc., and E.I. du Pont de Nemours, Inc. Agricultural and Industrial Chemicals as defendants in the suit. She asserted that the defendants' negligent and grossly negligent acts were the proximate cause of her exposure to BIDRIN 8 and her injuries. Brown subsequently dropped her claims against all defendants except Hopkins. Trial commenced on April 6, 1994. The following questions were submitted to and answered by the jury:

QUESTION NO. 1

Did the negligence, if any, of those named below proximately cause the injury in question?

Answer "Yes" or "No" for each of the following:

A. Patricia J. Brown NO

B. Sidney W. Hopkins NO

QUESTION NO. 4

On the occasion in question did Texas A & M University Research and Extension Center have the right to control the physical details as to the manner in which Sidney W. Hopkins sprayed the greenhouse?

Answer "Yes" or "No."

Answer: YES

On May 5, 1994, the trial court signed a judgment that Brown take nothing. Her subsequent motion for new trial was denied.

By her first point of error, Brown contends that the trial court erred in failing to grant a new trial based on newly discovered evi-

dence. To support this contention, Brown alleges that appellee's principal witness, Dr. Benedict, lied on the witness stand. During the trial, Brown introduced into evidence a "non-compliance" letter issued to Hopkins by the Texas Department of Agriculture (TDA) regarding his use of BIDRIN 8. Dr. Benedict was asked about the disposition of the letter. Dr. Benedict testified, over Brown's hearsay objection, that Charlie Thomas at the TDA had informed him that "the complaint had been dispensed." When asked by counsel and the trial court if he meant "dismissed," Dr. Benedict answered affirmatively. It is this testimony that Brown says is false. Brown contends that she could not reasonably foresee that Dr. Benedict would lie. Thus, she could not know what rebuttal testimony would be necessary. Moreover, Brown contends that this evidence was crucial to the jury's finding of no negligence and no proximate cause because this testimony created the impression that Hopkins did nothing wrong.

Brown says she spoke with Elaine L. Fannin after the trial. Fannin is the TDA assistant general counsel who issued the "non-compliance" letter. According to Brown, Fannin told her that the "non-compliance" letter was not dismissed. In Brown's view, this newly discovered evidence would enable a jury to conclude that Hopkins was negligent and that Hopkins' negligence was the proximate cause of her injuries.

■ A party who seeks a new trial on the ground of newly discovered evidence must satisfy the court that:

1) the evidence came to his knowledge since the trial;

2) it was not owing to want of due diligence that the evidence had not come to .his attention sooner;

3) the evidence is not cumulative; and

4) the evidence is so material that it would probably produce a different result if a new trial were granted.

*Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983); *Conover v. Jackson,* 710 S.W.2d 621, 625 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). Each of these elements

must be established by affidavit. 5 Mc-DONALD TEXAS CIVIL PRACTICE § 28:14 (1992).

▆▆▆ Whether a motion for new trial will be granted or denied lies within the sound discretion of the trial court, and the court's decision will not be disturbed absent a manifest abuse of discretion. *Jackson*, 660 S.W.2d at 809. An appellate court may reverse a trial court for abuse of discretion only if, after searching the record, it is clear that the trial court's decision was arbitrary and unreasonable. *Simon v. York Crane & Rigging Co.*, 739 S.W.2d 793, 795 (Tex.1987). When a trial court refuses to grant a new trial based on newly discovered evidence, every reasonable presumption will be made to affirm the trial court's decision. *Jackson*, 660 S.W.2d at 809–10; *Texas Employers Ins. Ass'n v. Ramirez*, 770 S.W.2d 896, 902 (Tex. App.—Corpus Christi 1989, writ denied). In reviewing a trial court's decision refusing a new trial, appellate courts recognize the well-established principle that the courts do not favor motions for new trial on the ground of newly discovered evidence, and such motions are reviewed with careful scrutiny. *Nguyen v. Minh Food Co.*, 744 S.W.2d 620, 622 (Tex. App.—Dallas 1987, writ denied).

▆▆▆ Brown contends that Dr. Benedict gave false testimony, but the evidence fails to show that he was *not* informed by TDA personnel that the complaint had been "dispensed." After reviewing Dr. Benedict's testimony, it is evident that he accepted the meaning of the word "dispensed" that was provided by counsel and the trial court. However, the word "dispensed" can also mean dealt with, handled, or disposed of. Charlie Thomas could have meant that TDA dealt with, handled, or disposed of the complaint by issuing the non-compliance letter.

Fannin's affidavit states that the case was not dismissed. Brown failed to show, however, that she could not have learned the status of the non-compliance letter prior to trial. Fannin's affidavit further states:

A notice of non-compliance is issued when the department has found a violation, but has elected not to pursue administrative penalties.

A notice of non-compliance is an enforcement action, however, it is not a docketed case. An order of dismissal is appropriate only for cases in which the department seeks administrative penalties and the case is docketed.

The implication is that at the time the letter was issued, TDA did not find the violation serious enough to warrant further action. We conclude that Brown has failed to show how Fannin's affidavit would alter the jury's belief that Hopkins was not negligent and not the proximate cause of Brown's injuries.

We hold that the trial court did not abuse its discretion in denying Brown's motion for new trial on this ground. We overrule appellant's first point of error.

By her second point of error, Brown complains that the trial court erred by allowing the hearsay testimony of Charlie Thomas concerning the status of the non-compliance letter. She contends that this evidence was crucial to most of the issues in the case. She also contends that the error was compounded when Hopkins' trial counsel emphasized this testimony during closing argument.

Dr. Benedict testified as follows:

Hopkins' Counsel: Dr. Benedict, are you aware of what the ultimate disposition of the notice of noncompliance was that the Texas Department of Agriculture sent to Sid Hopkins?

Dr. Benedict: My understanding in talking to Charlie Thomas at TDA is that the—

Brown's Counsel: Excuse me, Doctor. Hearsay, Judge. Objection.

Trial Court: Will be overruled if he knows.

Brown's Counsel: Right, but he got it from talking to someone else.

Trial Court: Well, you may testify what you know. You know what happened to the disposition of the hearing.

Dr. Benedict: Charlie Thomas told me that complaint had been dispensed.

▆▆▆ The admission or exclusion of evidence is largely within the trial court's discretion. *Adams v. Valley Fed. Credit Union*, 848 S.W.2d 182, 188 (Tex.App.—Corpus Christi 1992, writ denied). To obtain reversal of a judgment based on error in the admission or exclusion of evidence, appellant

must show that the trial court did in fact commit error, and that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989); *Downen v. Texas Gulf Shrimp Co.*, 846 S.W.2d 506, 512 (Tex.App.—Corpus Christi 1993, writ denied); Tex. R.App.P. 81(b)(1). A trial court's error in admitting testimony is harmful if the judgment was controlled by the testimony that should have been excluded. *Jamail v. Anchor Mortgage Serv., Inc.*, 809 S.W.2d 221, 223 (Tex.1991); *Gee*, 765 S.W.2d at 396; *accord Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 230 (Tex.1990). In order to determine if the judgment was controlled by improperly admitted evidence, the reviewing court must examine the entire record. *Jamail*, 809 S.W.2d at 223; *Mancorp, Inc.*, 802 S.W.2d at 230. An out-of-court statement offered for its truth is inadmissible unless 1) it can be classified as non-hearsay under Tex.R.Civ. Evid. 801(e) or 2) it falls within an exception recognized by law. *Urquhart v. Antrum*, 776 S.W.2d 595, 596 (Tex.App.—Houston [14th Dist.] 1988, no writ); Tex.R.Civ.Evid. 802.

■ The record is clear that Dr. Benedict was testifying about statements made to him by Charlie Thomas concerning the disposition of the non-compliance letter or the complaint. These were neither prior statements of a witness made under oath nor admissions of a party opponent under Rule 801(e). The statements do not fall within any legal exception. The statements were offered for the truth of the matter asserted that TDA was not going to take any action. We conclude that the statements are hearsay, and that the trial court erred in allowing such evidence to be presented to the jury. We must, therefore, determine if admission of this evidence, when considered in light of the whole record, resulted in the rendition of an improper verdict. *See Jamail*, 809 S.W.2d at 223.

■ Brown's work schedule for February 4, 1991, required her to stake and water the cotton plants and check the bolls. Brown testified that she entered the greenhouse and stayed for approximately one hour. The record reflects, however, that Hopkins performed this work just before spraying, and that Brown's work in the greenhouse would have been minimal. According to Dr. Benedict, standard operating procedure required Brown to check with either a supervisor or Hopkins before actually starting her work. The Center established this procedure to prevent excessive watering of the plants.

Brown testified that the plants were sticky to the touch but that this was typical when cotton plants were infested with aphids. There is no dispute that Brown was not orally informed of the spraying before she entered the greenhouse. In addition, at the time of the incident, Center technicians had not received safety training regarding the use of pesticides nor were they provided protective clothing or gloves.

The evidence reflects that any exposure Brown suffered was probably caused by contact with the plants and not from inhaling the BIDRIN 8. According to Dr. Benedict, the greenhouse was well ventilated by large fans and the air would have been free of BIDRIN 8 within 24 hours of spraying. Dr. Eric Comstock, a medical toxicologist, testified that even if the plants were sprayed with ten ounces of BIDRIN 8 for each gallon of water, after 24 hours, Brown would have been exposed to only the residue and not the full dosage of the pesticide. Expert testimony also showed that by the time Brown was exposed to BIDRIN 8, the plants should have absorbed most of the pesticide and been almost dry.

After working in the greenhouse for approximately one hour, Brown claims she became disoriented, experienced muscle spasms, shortness of breath, and facial numbness. She was also drooling uncontrollably and felt panicky. Initially, Brown attributed these symptoms to the heat. Brown informed her supervisors that she was feeling strange, and Dr. Benedict referred to various texts as he checked her for symptoms. A key symptom of significant BIDRIN 8 exposure is pinpoint pupils, but Dr. Benedict testified that Brown's eyes were fine. Dr. Benedict testified that Brown complained of a headache, but that she said she had one all the time. No one recalled seeing Brown drool. Expert testimony indicated

that Brown's symptoms were consistent with a mild exposure to BIDRIN 8.

Dr. Benedict testified that he informed Brown of the spray, read her the MSDS (material safety data sheets) and the pesticide label, told her to wash up and change clothes, and recommended that she see a doctor. Brown does not deny that this occurred, but claims that she does not remember anything that Dr. Benedict did. Other evidence, however, supports Dr. Benedict's testimony and shows that Brown refused medical treatment.

In July 1991, the Center became aware that Brown was concerned about her exposure to BIDRIN 8. In fact, Brown spent considerable time after the exposure working in the fields four to eight hours a day through November 1991. At times, these fields were also sprayed with BIDRIN 8. According to Dr. Benedict, it is common for technicians to experience respiratory problems when working in the fields because they are exposed to dust, fungal spores, bacteria, plant parts, cotton plant hairs, chemicals, pollen, and plant toxins. Sometime during the summer of 1991, the Center made respirators available to field workers when they experienced symptoms similar to those suffered by Brown.

Approximately two months after she was exposed to BIDRIN 8, Brown saw Dr. Lydia Gonzales. Brown told Dr. Gonzales that she had experienced chronic weakness and frequent urination for approximately one year. Brown was concerned about these symptoms because her mother was a diabetic. Dr. Gonzales subsequently retired and turned her practice over to Dr. Mark Dodson. When Brown complained of a chronic cough and breathing problems, Dr. Dodson referred her to Dr. John Pettigrove, a specialist in internal medicine and pulmonary disorders.

In August 1991, Dr. Pettigrove conducted extensive pulmonary function tests on Brown and reviewed the results of previously performed blood tests. Although Dr. Pettigrove treated Brown for mild asthma and headaches, he found no physical evidence to suggest Brown was exposed to the organophosphates contained in BIDRIN 8. Moreover, Dr. Pettigrove did not find any neurological changes or ongoing toxicity that would account for the depression Brown said she had. According to Dr. Pettigrove, symptoms of organophosphate exposure manifest themselves within a few hours and last a short time. Of all of Dr. Pettigrove's organophosphate patients, not a single one continued having symptoms of exposure after six months or a year. After his examination, Dr. Pettigrove suggested that Brown see a toxicologist and a psychologist.

The record reflects that the medical records of Dr. Horvat, a clinical psychologist, were admitted into evidence. In addition, two psychiatrists testified about Brown's psychological condition.

Dr. Joel Kutnick, a forensic psychiatrist, reviewed Brown's records and gave his opinion on the cause of Brown's condition. He did not actually see or treat Brown. Dr. Kutnick testified that because psychology is a very subjective field, it is necessary that the psychologist obtain an accurate patient history to make a proper diagnosis.

Dr. Robert McClung, Brown's treating psychiatrist, testified that if Brown gave him an accurate history and in the absence of other causing factors, he believed she had been exposed to high levels of a very toxic compound which precipitated her psychological problems.

Dr. Horvat's records show that he believed Brown's exposure to BIDRIN 8 caused a drop in her intelligence quotient (IQ). Brown told Dr. Horvat that she had been on the dean's list throughout college. Testing showed Brown's IQ to be 94. Dr. Horvat believed this score was inconsistent with her academic performance.

Brown's college transcript was produced and offered into evidence at the time of trial. The transcript showed that Brown was actually on scholastic probation throughout most of her college career. In fact, Brown only appeared on the dean's list for one semester. Dr. Kutnick and Dr. McClung both testified that Brown's scholastic record was consistent with her IQ score of 94.

Dr. McClung also testified that Brown complained of anger outbursts. Brown told

Dr. McClung that she did not have anger outbursts before she was exposed to BIDRIN 8. However, Brown did not tell Dr. McClung that she had been kicked out of high school athletics because of emotional outbursts. Brown also failed to tell Dr. McClung of the outbursts, crying spells, and mood swings that she experienced while working at the Texas A & M University Mariculture Project before she was employed at the Center. Dr. McClung admitted that if he had known this information, his diagnosis might have been different.

Dr. McClung admitted Brown to Charter Hospital in August 1992 because she was suicidal and because Dr. McClung was afraid that she might harm others. He believed that an organic mood disorder, precipitated by the exposure to BIDRIN 8, was the cause of Brown's problems. However, Brown did not tell Dr. McClung that just before she was hospitalized she believed her lesbian lover was being unfaithful to her. Dr. McClung testified that a troubled relationship was a psychostressor that could strain a person's coping abilities. In fact, Brown was hospitalized at Spohn Hospital in April 1993 following a suicide attempt soon after this troubled relationship ended. Dr. McClung did not believe the BIDRIN 8 exposure was the cause of the second hospitalization.

Dr. McClung also diagnosed Brown as having borderline personality traits that existed long before the February 1991 exposure. After reviewing all of Brown's records, Dr. Kutnick agreed with this diagnosis. Dr. Kutnick believed that these traits, not the BIDRIN 8 exposure, were the likely cause of Brown's emotional problems.

In July 1992, Brown sought medical advice from Dr. Eric Comstock, a medical toxicologist. Dr. Comstock reviewed Brown's medical records (from the date of her exposure to BIDRIN 8) and opined that her immediate symptoms were consistent with a mild exposure to BIDRIN 8. However, according to Dr. Comstock, BIDRIN 8 is not associated with asthma or the long-term disabilities Brown was claiming. Moreover, he was not aware of any studies that linked BIDRIN 8 with delayed neurotoxicity.[2] Dr. Comstock also testified that at Brown's request, he did not share his findings with any of Brown's doctors.

Brown's claims of delayed neurotoxicity initially appeared to be supported by the testimony of biochemist Dr. Edward Ezrailson. Dr. Ezrailson extrapolated the results of animal testing onto humans and concluded that organophosphates, such as BIDRIN 8, will cause delayed neurotoxic effects. On cross-examination, however, Dr. Ezrailson admitted that although there are studies implicating other organophosphates in delayed effects, no study specifically implicates BIDRIN 8. When Hopkins introduced a study that demonstrated no neurotoxic values for BIDRIN 8, Dr. Ezrailson rejected the study because it was outdated. However, Hopkins pointed out that other material which Dr. Ezrailson was relying on was actually older.

During her testimony, Brown admitted that she had lied in a deposition about being gay. Brown claimed that her family was very supportive of her lifestyle. However, medical records showed that she experienced a great deal of stress because of a strained family relationship. Although Brown testified that she never experienced allergies before the BIDRIN 8 exposure, medical records showed that she was allergic to grass, dairy products, cat fur, and dog dander. Records from Stephen F. Austin University showed that Brown, while a student, received allergy injections and that her mother suffered from asthma. Brown also claimed that after the exposure she had a very difficult time concentrating and controlling her temper. However, Brown admitted that during this same period she dealt with sixth graders on a daily basis and she did not experience such difficulties. Moreover, evaluations of Brown's teaching performance showed that she was viewed as an outstanding teacher.

Brown offered and the trial court admitted the TDA non-compliance letter to rebut Dr. Benedict's testimony. During closing argument, Brown's trial counsel read a portion of

2. Brown blamed "delayed neurotoxicity" for her delay in seeking medical treatment for her exposure to BIDRIN 8.

the letter indicating that Hopkins had violated state laws. The letter also stated:

> IF THE DEPARTMENT LATER FINDS THAT YOU HAVE COMMITTED ADDITIONAL VIOLATIONS OF THE SAME TYPE WITHIN ONE YEAR FROM THE DATE OF THIS NOTICE, ANY RESULTING ENFORCEMENT ACTIONS MAY INCLUDE THIS CHARGE. ANY PENALTIES RESULTING FROM LATER ENFORCEMENT ACTIONS MAY TAKE THIS WARNING INTO ACCOUNT.

Brown's counsel argued that this language meant action was deferred rather than dismissed.

During closing argument, Hopkins' trial counsel reminded the jury of Dr. Benedict's testimony that the TDA action had been dismissed. Brown objected that there was no such evidence, but the trial court overruled the objection. We conclude that Hopkins' counsel was only informing the jury that it, and not the TDA, was the sole judge of the credibility and weight to be given the evidence in this case.

In light of the above evidence, we hold that the trial court's error in admitting the hearsay evidence did not cause the rendition of an improper verdict. Accordingly, we overrule Brown's second point of error.

By her third point of error, Brown contends that the trial court erred by failing to grant a new trial because the jury's finding of no negligence and no proximate cause was incorrect because negligence and proximate cause were established as a matter of law.

By her sixth point of error, Brown contends that the trial court abused its discretion by asking the jury to determine whether Texas A & M had the right to control Hopkins' actions. Brown contends that the submission of that question to the jury was error because she established as a matter of law that Hopkins violated federal and state laws when he used BIDRIN 8 in a manner inconsistent with labeling requirements.

After reviewing the pleadings, we find that Brown did not allege that Hopkins violated any specific federal or state laws, or that Hopkins was negligent *per se.* We also find,

after reviewing the record, that Brown did not ask the trial court to instruct the jury that Hopkins was negligent as a matter of law.

■ A party relying upon a statutory violation should plead this reliance and should reasonably identify the statute relied upon if he is to recover on that basis. *Murray v. O & A Express, Inc.,* 630 S.W.2d 633, 636 (Tex.1982); *Eagle Trucking Co. v. Texas Bitulithic Co.,* 612 S.W.2d 503, 506 (Tex. 1981). If the plaintiff established that the defendant was negligent as a matter of law, that negligence should be made known to the jury. *Eagle Trucking,* 612 S.W.2d at 507. Because Brown did not satisfy this requirement, the trial court did not abuse its discretion in denying a new trial on these grounds. Brown's reliance on *Muncy v. Magnolia Chemical Co.,* 437 S.W.2d 15 (Tex.Civ.App.—Amarillo 1968, writ ref'd n.r.e.), is misplaced because the appellant in that case clearly based his theory of recovery on negligence *per se. Id.* at 17. We overrule Brown's third and sixth points of error.

By her fourth point of error, Brown contends that the trial court erred by failing to grant a new trial because the jury's failure to find that Hopkins was negligent and proximately caused Brown's damages was so clearly against the great weight and preponderance of the evidence as to be manifestly unjust.

■ When a party with the burden of proof complains that a jury's finding is "against the great weight and preponderance of the evidence," we examine the entire record and consider all the evidence to see if there is sufficient evidence to support the jury's answer. *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986); *American Gen. Fire & Casualty Co. v. McInnis Book Store,* 860 S.W.2d 484, 489 (Tex.App.—Corpus Christi 1993, no writ). We reverse the judgment only if the verdict is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *American Gen. Fire,* 860 S.W.2d at 489; *Hipp v. J.D. Lowrie Well*

*Serv., Inc.,* 800 S.W.2d 668, 670 (Tex.App.—Corpus Christi 1990, writ denied).

In light of the evidence set forth above, especially the evidence discussed under appellant's second point of error, we hold that the jury's finding is not against the great weight and preponderance of the evidence. Accordingly, we overrule Brown's fourth point of error.

By her ninth point of error, Brown complains that the trial court abused its discretion by failing to grant her motion for new trial because the court overruled her motion to strike Hopkins' supplemental answer. Brown contends that Hopkins' supplemental answer raised for the first time, within 30 days of trial, the defense that Hopkins was exempt from liability because of the Workers' Compensation Act. In addition, Brown contends that Hopkins denied her the opportunity to redepose persons with knowledge of relevant facts concerning the workers' compensation defense because Hopkins filed his supplemental answer on the last day that a docket control order allowed the parties to conduct discovery.

On March 17, 1993, the trial court signed a docket control order setting March 4, 1994, as the last day for discovery. The court also ordered that Brown could amend her pleadings on or before March 14, 1994, and that Hopkins could amend his pleadings on or before March 21, 1994. Hopkins filed his supplemental answer on March 4, 1994. Brown claims that she received a copy on March 8th. On the first day of trial, April 4, 1994, Brown filed a motion to strike Hopkins' supplemental answer. The trial court denied Brown's motion to strike.

We note that Hopkins called his pleading "supplemental." The pleading, however, raised the affirmative defense of immunity under the Texas Workers' Compensation Act pursuant to TEX.REV.CIV.STAT. ANN. art. 8308–4.01 (now codified at TEX.LAB. CODE ANN. § 408.001 (Vernon 1996)).[3] This amounted to an amendment of the original answer and is, therefore, subject to the provisions of TEX.R.CIV.P. 63 concerning the time limit for filing amended pleadings. *See Diesel Fuel Injection Serv. v. Gabourel,* 893 S.W.2d 610, 611 (Tex.App.—Corpus Christi 1994, no writ); *Food Source, Inc. v. Zurich Ins. Co.,* 751 S.W.2d 596, 599 (Tex.App.—Dallas 1988, writ denied). Rule 63 provides that "[p]arties may amend their pleadings ... at such time as not to operate as a surprise to the opposite party; provided, that any pleadings ... offered for filing within seven days of the date of trial or thereafter, or after such time as may be ordered by the judge under Rule 166, shall be filed only after leave of the judge is obtained, which leave shall be granted ... unless there is a showing that such filing will operate as a surprise to the opposite party." TEX. R.CIV.P. 63.

Hopkins filed his amended answer before the court-ordered deadline of March 21, 1994. Although Brown sought a continuance of the hearing on Hopkins' motion for summary judgment,[4] she did not request a continuance of the trial because of the amended answer. In addition, Brown did not ask the court to allow her to continue with discovery because of the new affirmative defense. Moreover, the record reflects that after the discovery deadline, the parties conducted other discovery by agreement.

---

**3. Art. 8308–4.01. Exclusive remedy; exemplary damages**

(a) Except as provided by Subsection (b) of this section, a recovery of workers' compensation benefits under this Act is the exclusive remedy of an employee or legal beneficiary against the employer or an agent, servant, or employee or the employer for the death of or a work-related injury sustained by a covered employee.

(b) This section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence. For the purposes of this section, "gross negligence" has the meaning assigned to it by Section 41.001, Civil Practice and Remedies Code.

Act of December 12, 1989, 71st Leg., 2d C.S., ch. 1, § 4.01, 1989 Tex.Gen.Laws 1, 32 (repealed 1993) (current version at TEX.LAB.CODE ANN. § 408.001 (Vernon 1996)).

**4.** Hopkins' motion for summary judgment was also filed on March 4, 1994.

Brown cites our opinion in *Valdez v. Lyman–Roberts Hosp., Inc.,* 638 S.W.2d 111, 115 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.) as authority that Hopkins' three-year delay in amending his pleadings was improper. *Valdez* is inapposite. The appellants in *Valdez* had to seek leave of court to file amended pleadings because the docket control order's deadline for amended pleadings had already passed.

In the present case, the trial court's docket control order specifically allowed Hopkins to file amended pleadings on or before March 21, 1994. Hopkins' amended answer was filed on March 4, 1994. We hold that the trial court did not abuse its discretion by failing to grant Brown's motion for new trial because its denial of Brown's motion to strike was proper. Accordingly, we overrule Brown's ninth point of error.

By her seventh point of error, Brown complains that the trial court erred by denying her motion for new trial and abused its discretion by asking the jury to determine whether Texas A & M had the right to control Hopkins' actions and by allowing evidence regarding that question. Brown contends that the trial court's submission of Question No. 4 suggested to the jury that any violation of federal and state laws by Hopkins could be excused if Texas A & M controlled the details of Hopkins actions. She also contends that the submission of Question No. 4 was a comment on the weight of the evidence.

 As stated above, Hopkins' pleadings raised the affirmative defense of immunity under the Texas Workers' Compensation Act. As a general rule, the burden of proving an affirmative defense rests upon the party asserting it. *Fredonia State Bank v. General Am. Life Ins. Co.,* 906 S.W.2d 88, 90 (Tex.App.—Tyler 1995, n.w.h.); *Arguelles v. Kaplan,* 736 S.W.2d 782, 785 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.); *Chrysler–Plymouth City, Inc. v. Guerrero,* 620 S.W.2d 700, 706 (Tex.Civ.App.—San Antonio 1981, no writ). A key element of the affirmative defense in this case was whether Texas A & M had the right to control the physical details as to manner of performance, which is characteristic of the relationship of master and servant. *See McKelvy v. Barber,* 381 S.W.2d 59, 62–63 (Tex.1964). Therefore, Hopkins was entitled to introduce evidence that his actions were taken under the direction and control of Dr. Benedict, and the trial court did not err in admitting such evidence.

 It is well settled that each party, whether plaintiff or defendant, is entitled to the affirmative submission of all of his theories which have support in the evidence. Tex.R.Civ.P. 278; *Moore v. Lillebo,* 722 S.W.2d 683, 686–87 (Tex.1986); *Wright Way Constr. Co. v. Harlingen Mall Co.,* 799 S.W.2d 415, 422 (Tex.App.—Corpus Christi 1990, writ denied); *Ahlschlager v. Remington Arms Co.,* 750 S.W.2d 832, 835 (Tex. App.—Houston [14th Dist.] 1988, writ denied). Because there is some evidence showing that Texas A & M was in control of Hopkins' actions on February 4, 1991, we hold that the trial court's submission of Question No. 4 to the jury was proper. We overrule Brown's seventh point of error.

By her fifth point of error, Brown contends that the trial court erred in overruling her motion for new trial because the evidence was factually insufficient to support the jury's finding in Question No. 4 that Texas A & M had the right to control the details of Hopkins' actions.

 We conclude that this jury finding is immaterial to the verdict. A question is immaterial when it should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994); *see C & R Trans., Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966). We have previously held that Question No. 4 was properly submitted to the jury. However, the jury's finding of no negligence and no proximate cause in Question No. 1 rendered the jury's finding in Question No. 4 immaterial to the verdict. We overrule Brown's fifth point of error.

By her eighth point of error, Brown complains that the trial court erred by overruling her motion for new trial because Hopkins' final jury argument on payment of medical

bills constituted incurable argument and harmful error. Brown contends that this argument violated the collateral source rule.

■ To obtain reversal of a judgment on the basis of improper jury argument, an appellant must show:

1) the improper argument;

2) that such argument was neither invited nor provoked;

3) preservation of the error by proper trial predicate; and

4) incurability of the error by instruction, withdrawal of the statement or a reprimand by the trial judge.

*Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–40 (Tex.1979); *Williams v. Lavender*, 797 S.W.2d 410, 413 (Tex.App.—Fort Worth 1990, writ denied). Appellant must also show that the argument by its nature, degree and extent constituted reversibly harmful error. *Standard Fire*, 584 S.W.2d at 839–40; *Williams*, 797 S.W.2d at 413.

Brown complains of the following jury argument:

Hopkins' Counsel: Well, let's see what evidence there is concerning damages. First of all, the medical care. You saw the evidence. Medical care has been mainly paid for by Texas A & M University. You saw Dr. McClung that his entire bill was paid by Texas A & M University. You heard the testimony of Pat Brown that part of her bill has been paid, the hospital bills have been paid by Texas A & M University. Therefore, I ask you whether or not if A & M is paying for medical bills why is she seeking medical, Sid Brown—Sid Hopkins to—to pay her more medical? They've been paid. So that's the first question I ask you in that regard. Secondly, is a question of proximate cause.

Brown's Counsel 1: Judge, excuse me. May we approach the bench?

Trial Court: All right.

(The following is a bench conference.)

Brown's Counsel 1: On the record? We just need to, for the record, lodge an objection to protect the record in regards to the bills being paid by A & M on behalf of Mr.—

Court Reporter: Paid by what?

Brown's Counsel 1: Paid by Texas A & M.

Brown's Counsel 2: Your Honor, the original admonitory instructions the court gives the entire jury panel says they're not to consider insurance, whether a person has it or not. I'd object to workers' compensation, Your Honor. We object to it.

Trial Court: Overruled.

Brown contends that this argument was intended to suggest to the jury that the appropriate damages award for medical services was zero. Brown also argues that Hopkins' argument was improper because it violated a motion in limine prohibiting discussion of workers' compensation.

■ Generally, information concerning workers' compensation benefits is inadmissible in a suit against a third-party tortfeasor because it is not material and it could confuse the jury. *General Motors Corp. v. Saenz*, 829 S.W.2d 230, 243 (Tex.App.—Corpus Christi 1991), *rev'd on other grounds*, 873 S.W.2d 353 (Tex.1993); *J.R. Beadel & Co. v. De La Garza*, 690 S.W.2d 71, 74 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Exceptions to this rule exist for impeachment purposes, but only when a witness gives testimony inconsistent with receipt of benefits. *General Motors Corp.*, 829 S.W.2d at 243; *De La Garza*, 690 S.W.2d at 74.

Brown first raised the issue of unpaid medical bills when she testified that Texas A & M paid her income benefits for a couple of months after her leave of absence but would not pay her medical bills. When Hopkins attempted to impeach Brown with Texas A & M records showing payment of some of Brown's bills, the trial court refused to admit such evidence. After Hopkins made an offer of proof, however, the court did tell the jury, "In your absence there was—have been some testimony medical bills of the Plaintiff had not been paid and actually some of the medical bills have been paid by Texas A & M University." Brown agreed that the court's statement was appropriate. During argu-

ment, Hopkins was free to remind the jury of this evidence.

Hopkins' counsel's argument, however, went beyond the court's statement and urged the jury not to award Brown damages for medical bills because Texas A & M had already paid most of them. Thus, Hopkins' counsel's comments were improper argument. The record shows that Brown did not invite or provoke Hopkins' counsel's remarks. When Hopkins' counsel finished with the improper part of the argument, Brown objected, and her objection was overruled. We find that Brown satisfied the initial *Standard Fire* requirements for improper jury argument. We must now determine whether this argument caused harmful error.

In making this determination, a reviewing court may properly inquire into the duration of the argument, whether it was repeated or abandoned, and whether there was cumulative error. *Standard Fire,* 584 S.W.2d at 839–40; *Williams,* 797 S.W.2d at 413. All of the evidence must be closely examined to determine the argument's probable effect, if any, on a material finding in the case. *Standard Fire,* 584 S.W.2d at 839–40; *Williams,* 797 S.W.2d at 413. Reversal of the judgment will follow where, after evaluation of the whole case, from voir dire to jury argument, it is shown that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence. TEX.R.APP.P. 81(b)(1); *Standard Fire,* 584 S.W.2d at 839–40; *Williams,* 797 S.W.2d at 413; *Ford Motor Co. v. Nowak,* 638 S.W.2d 582, 597 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

After reviewing the entire record, we conclude that appellee's improper jury argument did not cause reversible error. Counsel's improper remarks were isolated and corrected in later argument when he told the jury that part of Brown's medical bills were paid. In addition, there is evidence in the record, admitted without objection, that Texas A & M did pay specific medical bills such as Dr. McClung's. Moreover, counsel prefaced the argument by alerting the jury that his comments related to the amount of

damages they should award. It is unlikely that appellee's argument caused the jury finding of no negligence and no proximate cause. We conclude that the greater probability is that the verdict was grounded on proper proceedings and evidence as discussed above. Because of this finding, the jury did not reach the issue of damages.

We hold that the trial court did not err in denying Brown's motion for new trial because any improper jury argument was harmless. We overrule Brown's eighth point of error.

By her tenth point of error, Brown contends that the trial court erred by not granting a new trial because the effect of the court's errors was cumulative and caused a manifestly unjust trial.

We have found two errors in the trial court's rulings. In both instances we have concluded that the errors were harmless.

Texas law recognizes that multiple errors, even if considered harmless taken separately, may result in reversal and remand for a new trial if the cumulative effect of such errors is harmful. *Scoggins v. Curtiss & Taylor,* 148 Tex. 15, 219 S.W.2d 451, 454 (1949); *Smerke v. Office Equip. Co.,* 138 Tex. 236, 158 S.W.2d 302, 304 (1941); *Texas Health Enter., Inc. v. Krell,* 828 S.W.2d 192, 210 (Tex.App.—Corpus Christi), *vacated by agr.,* 830 S.W.2d 922 (Tex.1992). Before a judgment will be reversed and a new trial ordered for cumulative error, an appellate court must determine that the error committed by the trial court was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Texas Health Enter.,* 828 S.W.2d at 210; *Ramos v. Champlin Petroleum Co.,* 750 S.W.2d 873, 877 (Tex.App.—Corpus Christi 1988, writ denied). In order to prevail on a cumulative error point, the appellant must show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to appellant. TEX. R.APP.P. 81(b)(1); *Texas Health Enter.,* 828 S.W.2d at 210.

After reviewing the entire record, we conclude that the trial court's errors did not cause the rendition of an improper ver-

dict. Accordingly, we overrule Brown's tenth point of error.

We affirm the judgment of the trial court.