COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-04-381-CV

 

 

JAMES R. DUNNAGAN AND                                                APPELLANTS

PARKER COUNTY=S SQUAW                                           AND
APPELLEES

CREEK DOWNS, L.P.                                                                            

 

                                                   V.

 

JOSEPH EARL WATSON                                                          APPELLEE

                                                                                 AND
APPELLANT



 

 

                                              ------------

 

             FROM
THE 43RD DISTRICT COURT OF PARKER COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.  Introduction








This appeal concerns a
dispute between Appellant and Cross-Appellee James R. Dunnagan (ADunnagan@)[1]
and Appellee and Cross-Appellant Joseph Earl Watson (AWatson@), two
members of a limited partnership who sued each other after repeated
disagreements ensuing from activities associated with the limited
partnership.  After a trial, a jury found
that Watson breached fiduciary duties that he owed to the limited partnership
and that it was not practicable for the limited partnership to continue.  In four issues, Dunnagan, as appellant,
complains that the trial court abused its discretion by refusing to strike
Watson=s second amended petition, that the trial court erred by denying his
motion to disregard jury findings and to reform judgment, that the evidence is
legally and factually insufficient to support the jury=s finding that Dunnagan=s actions rendered it not practicable for the limited partnership to
continue, and that the trial court abused its discretion by denying his motion
for new trial.  In two issues, Watson, as
cross-appellant, challenges the legal and factual sufficiency of the evidence
to support the jury=s finding
that he breached fiduciary duties owed to the limited partnership and the trial
court=s judgment awarding damages to the limited partnership.  We affirm the trial court=s judgment in all respects.

II.  Factual and Procedural Background








On September 22, 1997,
Dunnagan, Watson, and Larry Lawley (ALawley@) entered
into a limited partnership agreement for the purpose of  acquiring, holding, managing, and operating
the former Trinity Meadows horse racing facility in Willow Park, Parker County,
which Dunnagan, Lawley, and two other investors had purchased while the
facility was in bankruptcy.  The name of
the limited partnership was AParker County=s Squaw
Creek Downs, L.P.@ (Athe limited partnership@).  At the time of the limited
partnership=s inception,
Dunnagan owned forty-nine percent of the limited partnership and Watson and
Lawley each owned twenty-four and one-half percent of the limited
partnership.  All were limited partners.

Dunnagan, Watson, and Lawley
also formed Parker County III, Inc. (APC III@), a Texas
corporation that owned the remaining two percent of the limited partnership and
served as its general partner.  Dunnagan
owned fifty percent and Watson and Lawley each owned twenty-five percent of PC
III.  Watson served as the president,
Lawley as the vice-president, and Dunnagan as the secretary/treasurer of PC
III.








The limited partnership
applied for a Class 2 horse racetrack license with the Texas Racing Commission
in February 1998.  A few months later,
while the application for the license was pending, Lawley, along with Watson=s support, suggested that the limited partnership open a restaurant at
the facility in an effort to gain support from the horsemenCthe individuals who used the facility to train their horsesCand to demonstrate to the public that the facility was occupied and no
longer the former Trinity Meadows operation. 
Watson opined that the limited partnership would be granted a racing
license Asoon@ and that
the restaurant would help jump start the patronage.  Dunnagan, however, was opposed to opening the
restaurant because he did not think that it would be profitable.  Instead, he wanted to focus on obtaining a
racing license.  Tom Keating, the general
manager and CPA of the limited partnership from October 1997 to May 1999,
projected that the restaurant would not be profitable without a racing license.

Despite Dunnagan=s objections and concerns, the limited partners reached an agreement
regarding opening the restaurant.  The
minutes from a board meeting held on June 24, 1998 state,

The
fourth item on the agenda was the restaurant. 
Joel Watson and Larry Lawley agreed to be responsible for all the
expenses of the restaurant and with that agreement Jim Dunnagan did not have
any objection to moving forward with it opening as soon as possible.  Larry and Joel will also be entitled to all
of the profits from the restaurant if any between now and when the track
opens.  It is agreed between the partners
that once simulcasting begins the partners will all own and split the proceeds
and/or losses in the restaurant equally.

 

Thus, Watson and Lawley assumed responsibility
for all expenses associated with the restaurant until the racing license was
obtained.  








The restaurant opened in July
1998 and was initially managed by Lawley and Watson=s parents, Sherry and Larry Watson.[2]  At some point thereafter, however, Lawley no
longer participated in the actual operation of the restaurant, leaving Sherry
and Larry Watson with the responsibility. 
The restaurant=s utility
bills were in the name of the limited partnership.  The limited partnership never operated the
restaurant.

The limited partnership
operated the facility=s Abackside@ in 1997 and
1998.[3]  Although unprofitable, it was the only income
generated by the limited partnership during this time.  According to Dunnagan and Keating, Watson,
Lawley, and Weldon Kennedy, Watson=s grandfather, assumed the responsibility of operating the backside in
January 1999.  Similar to their agreement
with Dunnagan regarding the restaurant, Watson and Lawley agreed to operate the
backside at their own risk, assuming all of the losses and profits until the
racing license was acquired.  Watson
testified that he and Lawley did not assume control and operation of the
backside until December 1999.













In March 1999, the Racing
Commission denied the limited partnership=s application for a racing license. 
For the most part, it was at this point that the disagreements between
the limited partners over various issues associated with the limited
partnership began.  Dunnagan indicated
that he would no longer make any contributions to the limited partnership.  He also wanted to close the backside because
it was losing money.  Watson and Lawley,
however, voted to keep the backside open, as indicated by the minutes from a
board meeting held on October 7, 1999, and continued to operate it under the
same understanding regarding expenses and profits.  The Watsons also continued to operate the
restaurant after the racing license was denied in order to continue building Agood faith@ with the
patrons and horsemen, to be up and running once the racing license was granted
following a successful appeal of the initial decision denying the license, and
to occupy the facility for insurance purposes. Dunnegan testified that he did
not believe that the limited partnership was being treated fairly and that he
expected the Watsons to pay rent to the limited partnership if they continued
to operate the restaurant and backside after the racing license was
denied.  Watson did not recall Dunnagan
suggesting that the facilities should be leased.  The Watsons operated the restaurant and
backside until November 1, 2002.  PC III
assumed possession, operation, and control of the backside on November 1, 2002,
pursuant to an order entered by the trial court modifying a mutual temporary
injunction initially entered into on June 25, 2001.[4]

Dunnagan and Watson also
became involved in a dispute over Lawley=s interests in the limited partnership and shares in PC III.  Dunnagan had offered to purchase all of
Watson=s and Lawley=s shares in
PC III and interests in the limited partnership, but Watson objected and
contended that the limited partnership agreement and the shareholders agreement
required Lawley to offer his interests in PC III to him first.  Kennedy also obtained an injunction enjoining
Dunnagan from purchasing Watson=s and Lawley=s shares and
interests.  Lawley therefore offered to
sell his interests in the limited partnership and PC III to Watson, who
accepted.  Watson ultimately made only
two of the three required payments under his agreement with Lawley, and
Dunnagan purchased Lawley=s remaining
shares of stock and interest in the limited partnership. Thereafter, Lawley
owned no interest in the limited partnership and zero shares in PC III.








Watson sued Dunnagan and
Lawley in June 2001.  He sought
injunctive relief to maintain the status quo of the limited partnership, a
declaratory judgment to determine the ownership of Lawley=s shares and limited partnership interest, and damages for breach of
fiduciary duties.  Dunnagan filed a
third-party petition against Watson, alleging that Watson breached fiduciary
duties.

At a meeting of the PC III
board of directors on January 30, 2003, Watson was voted out as president and
Lawley was voted out as vice-president of PC III.  Dunnagan was elected as president and
secretary of PC III.

Dunnagan and Watson went to
trial in February 2003.[5]  The jury found that Dunnagan did not breach
any fiduciary duties owed to the limited partnership, that Watson did breach
fiduciary duties owed to the limited partnership, that Watson=s breach of fiduciary duties caused the limited partnership damages in
an amount of $459,645.69, that Watson loaned $0 to the limited partnership to
pay its debts, and that it would not be practicable for the limited partnership
to continue.  The jury also determined
the total capital contributions made by Dunnagan and Watson and the account
balance of their respective capital contributions.








The trial court entered
judgment on the verdict, which, among other things, ordered that the limited
partnership be dissolved.  Dunnagan
subsequently moved to disregard the jury=s answer to question number eight (judicial dissolution) and to reform
the judgment.  In the alternative,
Dunnagan moved for a new trial.  The
trial court denied the motion.  Both
parties appealed.

III.  Watson=s Second Amended Petition

In his first issue, Dunnagan
argues that the trial court abused its discretion by refusing to strike Watson=s second amended petition, which was filed seven days before the
February 17, 2003 trial setting and added a new cause of action for judicial
dissolution of the limited partnership. 
He argues that Watson=s second amended petition was prejudicial on its face because it
asserted a new cause of action and that the amendment surprised him.  Watson responds that his cause of action for
judicial dissolution of the limited partnership was not a fundamental or
wholesale change in the nature of the lawsuit and that events preceding the
trial warranted the inclusion of the additional claim.








Rule 63 of the Texas Rules of
Civil Procedure governs pleading amendments. 
Tex. R. Civ. P. 63.  A party may amend its pleadings at any time
unless the amendment will operate as a surprise; however, any pleadings offered
for filing within seven days of trial shall be filed only after leave of court
is obtained.  Id.  

The trial court has no
discretion to refuse an amendment unless the opposing party presents evidence
of surprise or prejudice or the amendment is prejudicial on its face because,
for example, it asserts a new cause of action or defense.  Greenhalgh v. Serv. Lloyd=s Ins. Co., 787 S.W.2d 938, 939 (Tex.
1990); Hardin v. Hardin, 597 S.W.2d 347, 349-50 (Tex. 1980).  However, merely because an amended pleading
asserts a new cause of action does not make it prejudicial to the opposing
party as a matter of law.  Smith
Detective Agency & Nightwatch Serv., Inc. v. Stanley Smith Sec.,
Inc., 938 S.W.2d 743, 749 (Tex. App.CDallas 1996, writ denied). 
Accordingly, an amendment is prejudicial on its face if (1) it asserts a
new substantive matter that reshapes the nature of the trial itself, (2) the
opposing party could not have anticipated the amendment in light of the prior
development of the case, and (3) the opposing party=s presentation of the case would be detrimentally affected.  Id.; see also Rusk v. Rusk, 5
S.W.3d 299, 309 (Tex. App.CHouston [14th Dist.] 1999, pet. denied).  The burden of showing surprise or prejudice
is on the party resisting the amendment. 
Hardin, 597 S.W.2d at 349.








We review the trial court=s ruling allowing an amended pleading for an abuse of discretion.  Id. at 349-50.  A trial court abuses its discretion when its
ruling is arbitrary, unreasonable, or without reference to any guiding rules or
legal principles.  K-Mart Corp. v.
Honeycutt, 24 S.W.3d 357, 360 (Tex. 2000).

Here, Dunnagan=s sole argument that Watson=s second amended petition was prejudicial on its face is only that it
asserted a new cause of action for judicial dissolution.  Because an amended pleading that asserts a
new cause of action does not, as a matter of law, make it prejudicial to the
opposing party, Dunnagan=s argument
that the amendment was prejudicial on its face merely because it asserted a new
cause of action is unpersuasive.  See
Stanley Smith Sec., Inc., 938 S.W.2d at 749.








Nonetheless, he does not
argue that he could not have anticipated the amendment in light of the prior
development of the case or that his case was detrimentally affected, two of the
three factors used to determine if an amendment is prejudicial on its face.  See id.  Dunnagan does, however, state that AWatson=s amendment
clearly reshaped his causes of action.@  But Section 8.02 of the Texas
Revised Limited Partnership Act provides that a court may dissolve a limited
partnership if it Adetermines
that another partner has engaged in conduct relating to the limited partnership
business that makes it not reasonably practicable to carry on the business in
limited partnership with that partner.@  Tex. Rev. Civ. Stat. Ann. art. 6132a-1, ' 8.02(2) (Vernon Supp.
2006).  Watson=s other primary claim was breach of fiduciary duty, a cause of action
also focusing on the conduct of one or more individuals within the context of
some business entity.  The evidence
submitted in support of both causes is thus not mutually exclusive and overlaps
to some extent.  Without further
explanation by Dunnagan, it is not Aclear@ how the
amendment Areshaped@ Watson=s case to
the extent that it was prejudicial on its face. 


Citing five factors applied
by one of our sister courts to determine whether there has been a showing of
surprise resulting from a pleading amendment, Dunnagan further argues that he
established that he was surprised by the amendment.  Dunnagan lists these factors as including (1)
how long the suit had been on file before the amendment was filed, (2) how soon
before trial the amendment was made, (3) whether the amendment presented a new
claim or cause of action, (4) whether the new cause of action was based on
recently discovered matters, and (5) whether the resisting party alleged
surprise and that he was not prepared to try the new cause of action.  See Stevenson v. Koutzarov, 795 S.W.2d
313, 321 (Tex. App.CHouston [1st
Dist.] 1990, writ denied)(op. on reh=g).








The third and fifth factors
are dispositive to our analysis and demonstrate how Stevenson is
distinguishable from this case.  In Stevenson,
the amendments to the petitions introduced five new causes of action and
increased liability from an estimated $30,000 to over $16.5 million.  Id. 
Emphasizing the third factor, the court held that the trial court abused
its discretion by denying the resisting party=s motion to strike the pleadings because the amendments constituted a Awholesale revision@ of the suit.  Id. Here,
Watson=s amendment ultimately added a single cause of action and did not seek
any additional monetary damages.  Considering
this and the entire record, we cannot say that the additional cause of action
constituted a Awholesale
revision@ of the suit.  And, as discussed
above, without any explanation to the contrary, the fact that Watson=s amended pleading set forth a new cause of action for judicial
dissolution is not in and of itself fatal to the amendment.








Under the fifth Stevenson factor,
we are to consider not only if the resisting party alleged surprise, but also
if the resisting party alleged that he was not prepared to try the new
cause of action.  See id.  Dunnagan alleged that he was surprised in his
motion to strike Watson=s second
amended petition because the facts upon which Watson based his claim for
dissolution had been in existence for at least three years and because much
discovery had been conducted in the absence of the claim.  But Dunnagan did not assert in his motion to
strike and he does not argue on appeal that he was not prepared to try the
dissolution claimCwhat is
probably the primary underlying rationale for denying an amended pleading on
the eve of trial.  As Watson points out,
the entire lawsuit was based on Dunnagan=s and Watson=s individual
actions and behavior as limited partners and was explored at great length over
the course of discovery.  The trial court
thus had a non-arbitrary and reasonable basis for its ruling.  Accordingly, we hold that the trial court did
not abuse its discretion by denying Dunnagan=s motion to strike Watson=s second amended petition on the grounds of prejudice or
surprise.  See Honeycutt, 24
S.W.3d at 360.  We overrule Dunnagan=s first issue.

IV.  Motion to Disregard Jury Findings and to
Reform Judgment








In his second issue, Dunnagan
argues that the trial court erred by denying his motion to disregard the jury=s answer to question number eight and his motion to reform the
judgment.  Question number eight asked
the jury whether Dunnagan=s actions
rendered it not practicable for the limited partnership to continue.  The jury answered AYes.@  Also
significant to this issue is the jury=s answer to question number two, which asked the jury whether Dunnagan
failed to comply with his fiduciary duties. 
The jury answered ANo.@  Dunnagan argues that because
the conduct upon which Watson sought to dissolve the limited partnership was
based solely on Dunnagan=s alleged
breaches of fiduciary duty, the jury=s ANo@ answer to question number two conclusively negated the jury=s AYes@ answer to question number eight. 
Dunnagan further argues that the jury=s answer to question number two, at the very least, rendered its
answer to question number eight immaterial and that the jury=s answer to question number eight should have been disregarded because
Watson had unclean hands.

A trial court may disregard a
jury=s finding if there is no evidence to support the jury=s finding or if it is immaterial. 
Southeastern Pipe Line Co., Inc. v. Tichahek, 997 S.W.2d 166, 172
(Tex. 1999); Alm v. Aluminum Co. of America, 717 S.W.2d 588, 593 (Tex.
1986).  A no evidence challenge may be
sustained when the evidence establishes conclusively the opposite of a vital
fact.  Uniroyal Goodrich Tire Co. v.
Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S.
1040 (1999).  Anything more than
a scintilla of evidence is legally sufficient to support the finding.  Cont=l Coffee Prods.
Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby,
935 S.W.2d 114, 118 (Tex. 1996).

A.  Conclusive Negation








Watson initially argues that
Dunnagan waived his right to appeal the jury=s answer to question number eight because he failed to object to the
instruction before the jury was discharged and failed to submit a written request
seeking different instructions.  Because
Dunnagan is not complaining of the form of the instruction or arguing that a
conflict exists between jury question number two and eight, we hold that
Dunnagan preserved error for this issue by raising it in his motion to
disregard jury findings and to reform judgment. 
See T.O. Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218,
220 (Tex. 1992) (reasoning that a no evidence challenge may be preserved
through a motion to disregard the jury=s answer to a
vital fact question).








Turning to the merits of the
issue, Dunnagan=s argument
that the jury=s answer to
question number two conclusively negated its answer to question number eight
rests upon an improper implication or misinterpretation stemming from the jury=s answer to question number two according to C. & R. Transp.,
Inc. v. Campbell, 406 S.W.2d 191, 194-95 (Tex. 1966).  Under Campbell, a jury=s failure to find a particular fact merely means that the proponent
failed to meet its burden of proving the fact by a preponderance of the
evidence.  Id.  It does not mean the reverse of the failed
fact finding.  Id.  Sustaining Dunnagan=s argument and holding that the jury=s answer to question number two negated its answer to question number
eight would force us to recognize that his actions in relation to the limited
partnership were appropriate since the jury found that he did not breach
his fiduciary duties owed to the limited partnership.  Indeed, the reasoning behind Dunnagan=s argument is evidenced in the hearing on his motion to disregard the
jury finding.  There, his counsel argued
that A[Watson] is the one who has done everything wrong, and a jury has
found that Mr. Dunnagan has done it right.@ [Emphasis added]  This is a
misinterpretation of the fact finding because, properly interpreted, the jury=s answer to question number two represents only a refusal by the jury
to find from a preponderance of the evidence that Dunnagan breached fiduciary
duties owed to the limited partnership, not that his actions were appropriate
and that there is thus no basis for the jury=s answer to question number eight. 
See id.; Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690
(Tex. 1989); Greenwelge v. Shamrock Reconstructors, Inc., 705 S.W.2d
693, 694 (Tex. 1986).

We further note that although
Dunnagan stresses that the conduct upon which Watson sought to dissolve the
limited partnership was confined to alleged breaches of fiduciary duty by
Dunnagan, jury question number eight merely asked the jury whether Dunnagan=s actions rendered it Anot practicable for [the limited partnership] to continue.@  It does not impliedly or
expressly condition the finding of Anot practicable@ on Dunnagan=s alleged breach of fiduciary duties. 
We overrule Dunnagan=s second issue to the extent he argues that the jury=s answer to question number two negated its answer to question number
eight.

B.  Immaterial








Dunnagan further argues that
the jury=s answer to question number two rendered its answer to question number
eight immaterial as a matter of law because, as above, Watson based his claim
for dissolution of the limited partnership on Dunnagan=s alleged breaches of fiduciary duty.

A question is immaterial when
it should not have been submitted, it calls for a finding beyond the province
of the jury, or when it was properly submitted but has been rendered immaterial
by other findings.  Tichacek, 997
S.W.2d at 172.  Here, the cases cited by
Dunnagan as support are distinguishable or inapposite because jury question
number eight had an effect on the judgmentCbut for the cause of action, instruction, and positive jury finding,
the process of winding up the limited partnership would not have been ordered
to begin through judicial dissolution.  Compare
Brown v. Hopkins, 921 S.W.2d 306, 317 (Tex. App.CCorpus Christi 1996, no writ) (holding that jury=s finding of no negligence and no proximate cause rendered jury
question regarding right of control immaterial).  Jury question number eight is not conditioned
on the jury=s answer to
question number two, nor is it rendered immaterial, like in Hopkins,
because it is part of Watson=s breach of fiduciary duty claim. 
Accordingly, the jury=s answer to question number two did not render its answer to question
number eight immaterial, and we overrule Dunnagan=s second issue to the extent that he makes this argument. 

C.  Unclean Hands








Dunnagan also argues that the
trial court erred by denying his motion to disregard jury question number eight
because Watson does not have clean hands. 
Dunnagan argues, again, that because the jury found that Watson breached
fiduciary duties owed to the limited partnership, he should have been precluded
from recovering on his equitable cause of action for dissolution of the limited
partnership.

The clean hands doctrine
requires that one who seeks equity, does equity.  In re Francis, 186 S.W.3d 534, 551
(Tex. 2006).  Equitable relief is not
warranted when the plaintiff has engaged in unconscionable, unjust, or
inequitable conduct with regard to the issue in dispute.  Id.; Crown Const. Co., Inc. v.
Huddleston, 961 S.W.2d 552, 559 (Tex. App.CSan Antonio 1997, no pet.).  However,
the rule is not absolute.  Omohundro
v. Matthews, 161 Tex. 367, 384, 341 S.W.2d 401, 410 (Tex. 1960).  The clean hands doctrine should not be
applied unless the party asserting the doctrine has been seriously harmed and
the wrong complained of cannot be corrected without the application of the
doctrine.  City of Fredericksburg v.
Bopp, 126 S.W.3d 218, 221 (Tex. App.CSan Antonio 2003, no pet.).  The
determination of whether a party has come to court with unclean hands is left
to the discretion of the trial court.  Francis,
186 S.W.3d at 551.













Dunnagan has not shown what
unconscionable, unjust, or inequitable conduct Watson engaged in with regard to
his judicial dissolution cause of action that would cause the equitable
relief to be unwarranted.  See
Huddleston, 961 S.W.2d at 559.  The
jury=s affirmative finding that Watson breached fiduciary duties is derived
from a cause of action independent from Watson=s judicial dissolution claim and is merely collateral thereto.  See Thomas v. McNair, 882 S.W.2d 870,
881 (Tex. App.CCorpus
Christi 1994, no writ). Dunnagan has also not explained how he has been or will
be harmed by the judicial dissolution of the limited partnership.  See City of Fredericksburg, 126 S.W.3d
at 221.  At trial, Dunnagan merely
testified that he did not want the limited partnership to be dissolved because
he wanted to operate the facility for five years and attempt to make a
profit.  This is not harm.  And Dunnagan has not shown how the wrong
complained of, assuming from his argument that it was Watson=s breach of fiduciary duty, could not be corrected without application
of the unclean hands doctrine.  Id.  The jury found that Watson breached fiduciary
duties owed to the limited partnership and assessed damages to the limited
partnership at $459,645.69.  The limited
partnership having been compensated for its damages, it is unclear what
injustice Dunnagan seeks to prevent or remedy through application of the
unclean hands doctrine vis-a-vis Watson=s judicial dissolution claim. 
For these and the above reasons, we overrule Dunnagan=s second issue.

V.  Sufficiency of the EvidenceCJudicial Dissolution

In his third issue, Dunnagan
argues that the trial court erred by denying his motion to disregard jury
findings and to reform judgment and his motion for new trial because the
evidence is legally and factually insufficient to support the jury=s answer finding to question number eight that his actions rendered it
not practicable for the limited partnership to continue.  Watson responds that the evidence is legally
and factually sufficient to support the jury=s answer to question number eight.

A.  Standards Of Review








A legal sufficiency challenge may only be sustained
when:  (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Martinez, 977 S.W.2d
at 334.  In determining whether there is
legally sufficient evidence to support the finding under review, we must
consider evidence favorable to the finding if a reasonable factfinder could,
and disregard evidence contrary to the finding unless a reasonable factfinder
could not.  City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005).  When the evidence offered to prove a vital
fact is so weak as to do no more than create a mere surmise or suspicion of its
existence, the evidence is no more than a scintilla and, in legal effect, is no
evidence.  Kindred v. Con/Chem, Inc.,
650 S.W.2d 61, 63 (Tex. 1983).

In contrast, an assertion
that the evidence is factually insufficient to support a fact finding means
that the evidence supporting the finding is so weak or the evidence to the
contrary is so overwhelming that the answer should be set aside and a new trial
ordered.  Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965).  We are
required to consider all of the evidence in the case in making this
determination, not just the evidence that supports the finding.  Mar. Overseas Corp. v. Ellis, 971
S.W.2d 402, 406-07 (Tex.), cert. denied, 525 U.S. 1017 (1998).  The trier of fact is the sole judge of the
credibility of the witnesses and the weight to be given to their
testimony.  Golden Eagle Archery, Inc.
v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).

B.  Not APracticable@ For The Limited Partnership To Continue








Section 8.02(2) of the Texas
Revised Limited Partnership Act provides that a court may decree dissolution of
a limited partnership if it is determined that Aanother partner has engaged in conduct relating to the limited
partnership business that makes it not reasonably practicable to carry on the
business in limited partnership with that partner.@  Tex. Rev. Civ. Stat. Ann. art. 6132aC1, '
8.02(2).  Jury question number eight
tracked most of the language of the statute and asked, ADo you find that the actions of James R. Dunnagan rendered it not
practicable for [the limited partnership] to continue?@  Thus, our sufficiency
examination will be guided largely by our interpretation of the phrase, Anot practicable for [the limited partnership] to continue,@ which we consider in light of Dunnagan=s Aactions.@  








Watson cites American
Jurisprudence Second to show what type of conduct may justify dissolution under
the practicability standard, and Dunnagan focuses on the language of the
statute itself.  Our primary objective, however,
when construing a statute is to give effect to the legislature=s intent.  Tex. Dep=t of Transp. v. Needham, 82 S.W.3d
314, 318 (Tex. 2002).  We first look to
the statute=s plain and
common meaning; if the statutory language is unambiguous, we will interpret the
statute according to its plain meaning.  Id.  A[E]very word in a statute is presumed to have been used for a purpose;
and a cardinal rule of statutory construction is that each sentence, clause and
word is to be given effect if reasonable and possible.@  Tex. Workers= Comp. Ins. Fund v. Del Indus., Inc. 35
S.W.3d 591, 593 (Tex. 2000). 
Construction of a statute that would make a provision useless is not
favored by law.  Conseco Fin.
Servicing Corp. v. J & J Mobile Homes, Inc., 120 S.W.3d 878, 884 (Tex.
App.CFort Worth 2003, pet. denied).

Here, Section 8.02(2) is
unambiguous, and the legislature=s intent is clear; we therefore apply its plain and ordinary meaning,
which is the interpretation advocated by Watson.








The record demonstrates that
Dunnagan refused to make any more capital contributions to the limited
partnership after the racing license had been denied and that at one point he
broke through the ceiling of the accountant=s office and removed computer hardware containing financial
information.  Dunnagan was opposed to
opening the restaurant because he did not think that it would be profitable,
and he wanted to close the backside because it was losing money.  The minutes from the meeting held on October
7, 1999 state that Athe partners
agreed there was a major disagreement on the future operation of the track.@  Watson and Lawley nonetheless
agreed to operate the restaurant and backside contrary to Dunnagan=s wishes, and Dunnagan did not want to have anything to do with the
operation of the restaurant and backside while they were under Watson=s control.  After the racing
license had been denied, Dunnegan did not think that the limited partnership
was being treated fairly.  He expected
the Watsons to pay rent to the limited partnership if they continued to operate
the restaurant and backside after the racing license was denied, which they
never did.  Dunnagan and Watson were also
involved in a dispute over Lawley=s interests in the limited partnership and shares in PC III.  Dunnagan subsequently voted Watson out as
president and Lawley out as vice-president of PC III and was elected as president
and secretary of PC III. Dunnagan now owns 59.7% of the limited partnership and
61% of the shares in PC III, which is a controlling interest in both the
limited partnership and PC III.  And as
described more thoroughly below, Dunnagan testified about the state of
disrepair that parts of the facility were in while under Watson=s control, which he has tried to remedy.  Dunnagan even testified that he did not think
that he could work with Watson and manage the facility together.








Under the plain and ordinary
meaning of Section 8.02(2), the above evidence constitutes Aactions@ by Dunnagan
demonstrating that it is no longer Apracticable@ for the
limited partnership to continue. 
Dunnagan=s argument
that he is the lawful owner of a majority interest in both the limited
partnership and PC III and that Watson would no longer be participating in the
management of the limited partnership, although well taken, advocates an
interpretation of Section 8.02(2) that avoids the statute=s plain and ordinary meaning and renders it virtually useless.  The evidence detailed above shows how the
ends of the limited partnership have been frustrated not only by the failure of
the limited partnership to obtain a racing license and operate a horse racing
track, which was the Apurpose@ of the limited
partnership, but by the seemingly endless disagreements and discontent between
Dunnagan and Watson.  Accordingly,
viewing the evidence favorable to the jury=s finding and
disregarding the evidence and inferences contrary thereto, we hold that the
evidence is legally sufficient to support the jury=s finding that the
actions of Dunnagan rendered it not practicable for the limited partnership to
continue.  See City of Keller, 168
S.W.3d at 827; Martinez, 977 S.W.2d at 334.  Moreover, considering all of the evidence,
the evidence supporting the same finding is not so weak or the evidence to the
contrary is not so overwhelming that the jury=s answer should be
set aside and a new trial ordered.  Garza,
395 S.W.2d at 823.  The evidence is thus
also factually sufficient to support the jury=s answer to jury
question number eight.  See Ellis
County State Bank v. Keever, 888 S.W.2d 790, 794 (Tex. 1994) (stating that
court of appeals need not detail supporting evidence when upholding the factual
sufficiency of the evidence underlying the trial court=s judgment).  We overrule Dunnagan=s third issue.








Dunnagan argues in his fourth issue that the trial court
abused its discretion by denying his motion for new trial, which he filed along
with his motion to disregard jury findings and to reform judgment.  He set forth the same grounds in each motion
and incorporated his arguments on appeal into his complaint regarding the trial
court=s denial of his
motion for new trial.  For the same
reasons articulated above, we hold that the trial court did not abuse its
discretion by denying Dunnagan=s motion for new
trial.  See Cliff v. Huggins, 724
S.W.2d 778, 778 (Tex. 1987) (stating that trial court=s decision on a
motion for new trial is reviewed for an abuse of discretion).  We overrule Dunnagan=s fourth issue.

VI.  Sufficiency of the EvidenceCBreach of Fiduciary Duties and Damages

In his first cross-issue,
Watson argues that the evidence is legally and factually insufficient to
support the jury=s finding
that he failed to comply with his fiduciary duties owed to the limited
partnership (jury question number one). In his second cross-issue, Watson
argues that the evidence is legally and factually insufficient to support the
jury=s finding assessing damages to the limited partnership for Watson=s breach of fiduciary duties in the amount of $459,645.69 (jury
question number three).  We apply the
same legal and factual sufficiency standards of review articulated above.  See City of Keller, 168 S.W.3d at 827; Martinez, 977 S.W.2d at 334; Mar. Overseas Corp., 971 S.W.2d
at 406-07; Kindred, 650 S.W.2d at 63; Garza, 395 S.W.2d at 823.

A.  Preservation Of
Error








Before examining the sufficiency of the evidence to support
the jury=s answers to
question numbers one and three, we address Dunnagan=s argument that
Watson waived his legal and factual sufficiency challenges to question number
three and his factual sufficiency challenge to question number one by failing
to preserve error.

To preserve a complaint for our review, a party must have
presented to the trial court a timely request, objection, or motion that states
the specific grounds for the desired ruling, if they are not apparent from the context
of the request, objection, or motion.  Tex. R. App. P. 33.1(a); see also
Tex. R. Evid. 103(a)(1).  In a jury trial, legal sufficiency issues or
points must be preserved through one of the following procedural steps in the
trial court: (1) a motion for instructed verdict; (2) a motion for judgment
notwithstanding the verdict; (3) an objection to the submission of the question
to the jury; (4) a motion to disregard the jury's answer to a vital fact
question; or (5) a motion for new trial. 
T.O. Stanley Boot Co., Inc., 847 S.W.2d at 220; Salinas v.
Fort Worth Cab & Baggage Co., 725 S.W.2d 701, 704 (Tex. 1987).  See generally William Powers, Jr.
& Jack Ratliff, Another Look at "No Evidence" and
"Insufficient Evidence," 69
Tex. L. Rev. 515, 530 (1991). 
With a few exceptions not applicable here, a complaint of factual insufficiency of the evidence to support a jury
answer must have been raised in a motion for new trial.  See Tex.
R. Civ. P. 324(b)(2).








Here, Watson, acting pro se
at the time, filed his AResponse and
Counter Motions to Motion to Disregard Jury Findings, to Reform Judgment, and
in the Alternative Motion for new Trial,@ which included a motion for new trial. Therein, Watson stated,

Watson
objects to the Judgment because the Judgement is void.  Further, the Judgment is erroneous, and/or
was wrongfully interpreted given the weight of the evidence presented and the
law applicable to such evidence rendering a verdict which was not factually
supported by the evidence and/or is legally insufficient . . . .


 

Specifically, as to damages, Watson
argued,

 

Watson objects to Paragraph 6 [of
the judgment, which set forth damages] because the damages arrived at and
deemed due and owing by Watson is erroneous, failed to take into account all of
the liabilities of the Partnership or the fair market value less encumbrances,
defects, physical circumstances and obsolescence, deferred maintenance and
other charges and costs properly attributable in diminution of damages, if any.

 








Because
Watson specifically objected to the jury=s damages award in
his motion for new trial, Watson preserved his legal and factual sufficiency
arguments for appeal.  See Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 324(b)(2); T.O. Stanley Boot Co., Inc., 847 S.W.2d at
220.  The same cannot be said for his
sufficiency argument regarding the jury=s finding that he
breached fiduciary duties, however. 
Watson did not specifically object to the jury=s finding that he
breached fiduciary duties owed to the limited partnership in his motion for new
trial.  Consequently, he did not preserve
for appellate review his factual sufficiency challenge to jury question number
one.  See Tex. R. App. P. 33.1(a)(1)(A); Arroyo Shrimp Farm, Inc. v.
Hung Shrimp Farm, Inc., 927 S.W.2d 146, 150-51(Tex. App.CCorpus Christi
1996, no writ) (AIn order to preserve an insufficient
evidence point for review, the motion for new trial must specifically point out
the deficiencies in a manner that adequately apprises the trial judge of those
deficiencies.@)[6]

B.  Breach Of
Fiduciary Duties

Fiduciary duties arise as a matter of law in certain formal
relationships, including the relationships between partners.  Ins. Co. of N. Am. v. Morris, 981
S.W.2d 667, 674 (Tex. 1998).  The term Afiduciary@ generally applies
Ato any person who
occupies a position of peculiar confidence towards another,A refers to Aintegrity and
fidelity,@ and contemplates Afair dealing and
good faith.@  Daniel
v. Falcon Interest Realty Corp., 190 S.W.3d 177, 185 (Tex. App.CHouston [1st
Dist.] 2005, no pet.).








In his second amended answer and third party petition, Dunnagan
alleged that Watson owed to the limited partnership and PC III the obligation
of good faith and fair dealing, an obligation not to usurp corporate
opportunities, and the obligation to seek the approval of the board of
directors before entering into certain agreements or incurring indebtedness on
behalf of the corporation and limited partnership.  Dunnagan alleged that Watson=s breach of
fiduciary duties caused him damages by depriving him of his right to obtain a reasonable
lease payment from Watson=s conducting of the restaurant and lease
and by incurring debt in the name of PC III.








The trial court=s charge to the
jury defined a fiduciary relationship as a Arelationship of
trust and confidence@ and instructed the jury that a fiduciary
relationship exists between a corporate officer or director and the
corporation.  The trial court instructed
the jury that the fiduciary duty of an officer or director includes the duty to
exercise care in the management of corporate affairs and that in determining
compliance with the fiduciary duties, the jury could consider whether the
transaction was fair and equitable to the limited partnership, whether the
officer or director acted in the utmost good faith and exercised the most
scrupulous honesty toward the limited partnership, whether the officer or
director placed his interests before the limited partnership=s interest,
whether the officer or director used his position to gain any benefit for
himself at the expense of the limited partnership, and whether the officer or
director placed himself in a position where his self-interest might conflict
with his obligations as a fiduciary.

The evidence demonstrates that the limited partnership had
no income producing activity after May 1999 and that the limited partners had
agreed that the limited partnership would not be responsible for any expenses
associated with the restaurant and backside. 
But Watson, along with his parents, incurred debt thereafter in the name
of the limited partnership through their operation of the restaurant and
backside.  Specifically, Watson and his
parents incurred debt in the name of the limited partnership through their
utilization of the services of Duncan Disposal, Weatherford Security, Clear
Fork Materials, a Sentrol security system, and the telephone and water
services.  Sherry Watson also leased pool
tables, a television satellite, and two dishwashers in the name of the limited
partnership.  Watson explained that
services were kept in the name of the limited partnership because the
restaurant and backside would be absorbed into the limited partnership once a
license was obtained.  But the limited
partnership never obtained the racing license. 
Watson testified that he did not expect the limited partnership to be
responsible for the debts to Duncan Disposal, Weatherford Security, and Clear
Fork Materials.








The record further demonstrates that it was thought that
the licensing process would take anywhere from 90 days to six months and that
Watson=s and Lawley=s running of the
restaurant and backside was to be for a Alimited period of
time.@  Dunnagan testified that he had a problem with
the Watsons not paying rent to the limited partnership for their continued use
of the restaurant and backside after the racing license had been denied because
they were not part of the limited partnership. 
Dunnagan therefore asked the Watsons to pay rent for their use of the
facility, which lasted for at least three years.  He testified that the following exchange took
place somewhere around March 1999: AI thought that
after the license was denied if they [the Watsons] were going to come in here
and operate it they should be paying rent for it.  I asked her [Sherry Watson], I said, >Why don=t you pay rent?=  And she says, >We own this place.=@

Viewing the evidence favorable to the jury=s finding and
disregarding the evidence and inferences contrary thereto, we hold that the
evidence is legally sufficient to support the jury=s finding that
Watson breached fiduciary duties owed to the limited partnership, particularly
Watson=s duty to ensure
that his operation of the restaurant and backside was fair and equitable to the
limited partnership and that he not place his interests therein before those of
the limited partnership.  See City of
Keller, 168 S.W.3d at 827; Martinez,
977 S.W.2d at 334.  We overrule Watson=s first
cross-issue.

C.  Damages








The jury has discretion to award damages within the range
of evidence presented at trial, so long as a rational basis exists for the jury=s
calculation.  Swank v. Sverdlin,
121 S.W.3d 785, 799 (Tex. App.CHouston [1st
Dist.] 2003, pet. denied).  A jury may
not, however, arbitrarily assess an amount neither authorized nor supported by
the evidence presented at trial.  First
State Bank v. Keilman, 851 S.W.2d 914, 930 (Tex. App.CAustin 1993, writ
denied)(op. on reh=g).

As discussed above, the record demonstrates that Watson,
along with his parents, incurred debt in the name of the limited partnership
through their operation of the restaurant and backside.  The jury heard testimony regarding a $52,800
outstanding electricity bill and a $24,662.32 debt for security services.  The jury also heard evidence that there
existed an outstanding water bill for $209,000 owed to the City of Willow Park,
of which the limited partnership was responsible for $46,000.








There is evidence that Watson failed to maintain the
facility.  Dunnagan explained how the
sand traps in each of the stable buildings were clogged and that some of the
horsemen knocked holes in the walls to help water drain more quickly.  He testified that Watson had let pipes freeze
on the fourth floor and that they burst and flooded portions of the
facility.  Dunnagan also testified that
one of the buildings on the property was burned down, that it was not insured,
and that its value was between $750,000 and one million dollars.  The surface of the racing track and the
railing surrounding it was also left in a state of disrepair, according to
Dunnagan.  He testified that the
grandstand had incurred damages of at least $25,000 and that the facility, as a
whole, has incurred damages of between $250,000 to $300,000.

Regarding Dunnagan=s claim about
Watson=s failure to pay
rent after the racing license had been denied, Dunnagan and Jennifer Osinga, a
real estate agent who was asked to valuate the restaurant and stabling
facility, both testified that a fair monthly rental value for the restaurant
was between $7,000 to $7,500 per month. 
Osinga testified that a reasonable monthly rental value for the backside
was $16,500 per month; Dunnagan testified that it was between $11,000 to
$12,500 per month.[7]








Thus, viewing the evidence favorable to the jury=s finding and
disregarding the evidence and inferences contrary thereto, we hold that the
evidence is legally sufficient to support the jury=s finding assessing damages to the limited partnership for Watson=s breach of fiduciary duties in the amount of $459,645.69.  See City of Keller, 168 S.W.3d at 827; Martinez, 977 S.W.2d at 334.  Moreover,
considering all of the evidence, the evidence
supporting the same finding is not so weak or the evidence to the contrary is
not so overwhelming that the jury=s answer should be set aside and a new trial ordered.  See Garza, 395 S.W.2d at 823.  The evidence is thus also factually
sufficient to support the jury=s answer to jury question number three.  See Keever, 888 S.W.2d at 794.  Accordingly, we overrule Watson=s second cross-issue.

VII.  Conclusion

Having overruled all four of
Dunnagan=s issues and both of Watson=s cross-issues, we affirm the judgment of the trial court.

 

 

DIXON W. HOLMAN

JUSTICE

 

 

PANEL
A:  CAYCE, C.J.; LIVINGSTON and HOLMAN,
JJ.

 

DELIVERED:  August 24, 2006

 

 











[1]Dunnagan=s notice of appeal and appellate
brief also state that these documents are filed by him derivatively on behalf
of Appellant and Cross-Appellee Parker County=s Squaw Creek Downs, L.P.  





[2]Watson was involved in a car crash
at the age of fifteen.  He is confined to
a wheelchair and is dependent on his parents for care.   





[3]The Abackside@ consists of the racetrack itself
and the stabling area.  The stabling area
contains almost a thousand stalls in nine or ten different barns.  Horse owners rent the stables and train their
horses on the racetrack. 





[4]The temporary injunction enjoined
Dunnagan and Watson from, among other things, convening any meetings of the
board of directors or shareholders of PC III or convening any meetings of the
limited partners of the limited partnership and committing any acts that would
disrupt the ongoing business at the facility.





[5]Although numerous other parties
were involved in the case in some manner prior to trial, only Watson, Dunnagan,
and the limited partnership went to trial.





[6]Watson did, however, assert in an
objection to the jury charge that the evidence supporting the jury=s finding that he breached
fiduciary duties was legally insufficient. 
Therefore, we will consider Watson=s legal sufficiency argument.





[7]The Watsons operated the restaurant
and backside until November 1, 2002.